(January 11, 1910.)

## STATE, Respondent, v. JOHN FLEMING, Appellant.

[106 Pac. 305.]

POSTPONEMENT OF TRIAL—AFFIDAVIT—ADMISSION—INSTRUCTIONS—RELEVANCY—SELF-DEFENSE—WEIGHT OF EVIDENCE—INSANITY—MOTION FOR A NEW TRIAL—NEWLY DISCOVERED EVIDENCE—COUNTER-AFFIDAVITS—MISCONDUCT AT TRIAL.

1. A motion for a continuance is addressed to the sound discretion of the trial court, and his ruling thereon will not be disturbed on appeal unless it appears there has been an abuse of such discretion.

2. Where an application for the postponement of the trial is based upon the absence of witnesses, and the state offers to admit that if present the witnesses would testify as set forth in the affidavit upon which the application for the postponement is based, it is not error for the trial court to overrule the application for postponement.

3. A defendant charged with a criminal offense, under the laws of this state, is required to exercise due diligence in preparing his case for trial, and where it appears that he has not been deprived of any legal right in the preparation or trial and full opportunity has been given to prepare his defense, it is not an abuse of discretion to deny the application for postponement.

4. No distinction is drawn by the statute of this state as to the showing required on an application for a continuance in a criminal case, whether the application be made at the first or a later term after the indictment is returned; but such fact may be taken into consideration by the trial court in determining the question of diligence.

5. *Held,* that the trial court did not err in refusing to give the following instruction: "The jury are instructed that if, from the evidence, they have any reasonable doubt as to whether the defendant, John Fleming, at the time of firing of the fatal shot, was under reasonable and honest fear that said deceased intended and was about to inflict upon him great bodily harm, and that he fired the shot under that belief and in self-defense, then the jury must acquit the defendant."

6. The following language, "The court instructs the jury that the policy of our law deems it better that many guilty persons should escape than that one innocent person should be convicted and punished," in an instruction is argumentative and should not be given, and where such matter is coupled with other matter proper to be given to the jury and the latter is covered by other instructions, it is not error for the trial court to refuse to give such instruction to the jury.

7. It is not error for the trial court to strike out and refuse to give the italicized portion of the following instruction: "The jury are instructed that evidence of confession or admission should be carefully scrutinized by the jury and received with great caution. *It is the most dangerous evidence that can be admitted in a court of justice and the most liable to abuse;* and though a witness is perfectly honest, it is impossible for him in most cases to give the exact words in which an admission was made and sometimes by the transposition of the words a party may give a meaning entirely different from that which was intended to be conveyed by the witness."

8. *Held,* that the trial court did not err in refusing to give the following instruction: "The jury are instructed that the statements of the defendant out of court are a very doubtful species of evidence and should be acted upon with great caution; and unless supported by other evidence tending to show that the prisoner is guilty of the crime charged, are sufficient to warrant a conviction."

9. It is not error for the trial court to refuse to give an instruction where the same subject matter is fully and clearly covered by other instructions given by the court.

10. *Held,* that the trial court did not err in giving the following instruction: "Should you first find that the defendant fired the fatal shot, then the court instructs you, gentlemen, that the true test and standard of accountability is: Had the defendant sufficient mental capacity to appreciate the character and quality of his acts? Did he know and understand that it was in violation of the rights of another and in itself wrong?. Did he know that it was prohibited by the laws of the state and that its commission would entail punishment and penalty upon himself? If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his acts, he is responsible to the law for the acts thus committed and is to be adjudged accordingly. A person in the possession of a sound mind who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of his act."

11. Evidence in this case examined and held to support the verdict of murder in the first degree.

12. After conviction upon the charge of murder, where affidavits are filed on motion for a new trial showing newly discovered evidence in conflict with that given on the trial, and directed to impeach and contradict witnesses who testified at the trial, and it does not appear that such evidence if received would or should change the result of the trial, the discretion of the court in denying the motion will not be disturbed.

13. Upon a motion for a new trial in a criminal case, it is proper for the court to receive and consider counter-affidavits, in relation to any pertinent matter, except the issue of fact to which the newly discovered evidence is addressed, in order to enable the court to properly and intelligently exercise its discretion in passing upon the motion, and to determine whether a new trial would result with reasonable probability in a different judgment.

14. Where a showing is made on a motion for a new trial to the effect that the wife of the defendant, who was in the courtroom and at his side, while the trial was in progress, was placed under arrest; and a counter-showing is made that such arrest created no commotion or disturbance or was not done in such a manner as to call the jury's attention to such arrest, and it further appears that defendant's counsel or the jury did not know that the defendant's wife was placed under arrest, such act on the part of the officer is not such misconduct as will entitle the defendant to a new trial.

(Syllabus by the court.)

APPEAL from the District Court of the Fourth Judicial District, for Lincoln County. Hon. Edward A. Walters, Judge.

Trial and conviction of murder in the first degree. Defendant appeals. *Affirmed.*

Hawley, Puckett & Hawley, for Appellant.

The defendant did not have a reasonable opportunity between the date of the offense and that of the trial to procure witnesses and prepare his defense; and if such is the case, a continuance should be granted. (9 Cyc. 188, and authorities cited in note 97.)

An instruction to the effect that evidence of confession or admission is the most dangerous evidence that can be admitted in a court of justice and most liable to abuse is proper. (*Garrison v. Aiken,* 2 Barb. (N. Y.) 25; 1 Ency. of Ev. 610, 611.) Evidence of admissions should be received with caution. (*Bullard v. Bullard,* 112 Iowa, 423, 84 N. W. 513; *Niles v. Rhodes,* 7 Mich. 374; *Ryder v. Emrich,* 104 Ill. 470; *Sadler v. Sadler,* 16 Ark. 628.)

The instruction, "The jury are instructed that it would be highly improper and wrong for them to regard any statements of the prosecuting attorney that are not based on the evidence in the case, if any such has been made, as entitled to any weight whatever in this case,".is proper, and not covered by the court's instruction No. 32. (Sackett's Instructions, 2d ed., 641, 724, No. 28; also at page 641, No. 31; *Kennedy v. People,* 40 Ill. 488; *Spies v. People,* 122 Ill. 1, 3 Am. St. 320, 12 N. E. 865, 17 N. E. 898.)

The court should never refuse·instructions asked by defendant in a criminal case, to which there is no valid objection, even if the jury has already been instructed on the point; and a prosecuting attorney should never object to such instructions. (*People v. Lachanais,* 32 Cal. 433.)

Testimony by persons present at the scene of the homicide, tending to show that the killing' was self-defense is a good ground for new trial, even in the absence of diligence in pro-

curing it.    (Wharton on Homicide, 355, 356; *Cline v. State* (Tex. Cr. App.), 71 S. W. 23.)

D. C. McDougall, Attorney General, J. H. Peterson, Assistant, and Frank T. Disney, for Respondent.

Only such instructions should be given as are pertinent to the evidence.    (*People v. Ah Too*, 2 Ida. 44, 3 Pac. 10; *Territory v. Evans*, 2 Ida. 425, 17 Pac. 139.)

The defendant did not act in self-defense in killing Langford, but was acting with a spirit of revenge and with a desire to inflict vengeance for some fancied wrong, and where such a motive is behind a killing, self-defense may not be availed of as a defense.    (Wharton's Criminal Law, 8th ed., sec. 485; *State v. Smith*, 12 Mont. 378, 30 Pac. 679.)

The record in this case fails to show that there was even a threat against the life of the defendant, and the cases all hold that there must be an overt act indicative of imminent danger at the time the act is committed.    (21 Cyc. 791, and cases cited; *People v. Bernard*, 2 Ida. 193, 10 Pac. 30; *People v. Pierson*, 2 Ida. 76, 3 Pac. 688; *State v. Schieler*, 4 Ida. 120, 37 Pac. 272.)

Error cannot be claimed in refusing to give an instruction which has been already substantially covered in the language of the court.    (*United States v. Camp*, 2 Ida. 231, 10 Pac. 226; *State v. Roland*, 11 Ida. 490, 83 Pac. 337; *State v. Rooke*, 10 Ida. 388, 79 Pac. 82; *State v. Bond*, 12 Ida. 424, 86 Pac. 43; *State v. Cotterel*, 12 Ida. 572, 86 Pac. 527; *State v. Rathbone*, 8 Ida. 161, 67 Pac. 186; *State v. Barber*, 13 Ida. 65, 88 Pac. 418.)

The filing of counter-affidavits has been employed in almost every criminal case prosecuted in this state, wherein appeal has been had.    (*State v. Levy*, 9 Ida. 483, 75 Pac. 227; *State v. Davis*, 6 Ida. 159, 53 Pac. 678.)    Our statute is in the exact words of the California statute.    (Sec. 1181, Kerr's Code, Penal; *People v. Fice*, 97 Cal. 459, 32 Pac. 531; *People v. Woon Tuck Wo*, 120 Cal. 297, 52 Pac. 833; *People v. Sing Yow*, 145 Cal. 1, 78 Pac. 235.)

Counsel alleges error in refusing to grant a new trial on the ground of newly discovered evidence. Doctors say that they have examined the defendant and find him insane. This evidence is clearly cumulative and a new trial could not be predicated thereon. (*State v. Davis,* 6 Ida. 159, 53 Pac. 678.)

An affidavit testifying to a threat should be accepted with a great deal of caution. If such testimony were to be accepted, and new trial ordered thereon, it would always be possible to find a friend of the defendant who would make an affidavit of this character to save his friend's life. In view of the evidence in the case, such testimony could have had no possible effect, and could not have changed the result of the verdict. (*State v. Bond,* 12 Ida. 424, 86 Pac. 43.)

With regard to all this evidence, we call the court's attention to the rule of due diligence. (*State v. Williams,* 12 Ida. 483, 86 Pac. 53; *State v. Cook,* 13 Ida. 45, 88 Pac. 240.)

The jury is the judge of the weight to be given to the testimony of witnesses, and this court will not interfere unless it is clearly shown that the verdict resulted from prejudice or passion, or is clearly against the evidence. (*State v. Levy,* 9 Ida. 483, 75 Pac. 227; *State v. Rathbone,* 8 Ida. 161, 67 Pac. 186; *State v. Bond,* 12 Ida. 424, 86 Pac. 43; *State v. Beard,* 6 Ida. 614, 57 Pac. 867; *State v. Hardy,* 4 Ida. 478, 42 Pac. 507; *State v. Cook,* 13 Ida. 45, 88 Pac. 240.)

STEWART, J.—On Sept. 21, 1908, the county prosecuting attorney in and for Lincoln county filed an information in the district court of said county against the defendant, charging him with the crime of murdering and killing one Frank Langford on July 8, 1908. On the same day he was arraigned upon such information and was represented by counsel and was given the statutory time in which to plead. On Sept. 22, 1908, the defendant with his counsel being present in court filed a demurrer to the information, which demurrer was overruled, and the defendant entered a plea of not guilty of the offense as charged in the information. By consent of counsel the cause was set for trial on Sept. 28th.

On Sept. 28th the case was called and the defendant was, present with his counsel; whereupon a motion for a continuance was made by the defendant, supported by his affidavit. The prosecuting attorney also filed a counter-affidavit and announced that he was willing to admit, that if the witnesses mentioned in the affidavit were present, they would testify as set forth in the affidavit. Whereupon, the motion for a continuance was overruled and the cause proceeded to trial. The case was tried and a verdict returned by the jury finding the defendant guilty of murder in the first degree as charged in the information. Judgment was rendered by the trial court sentencing the defendant to be executed in accordance with law. A motion for a new trial was made and overruled. This appeal is from the judgment and from the order overruling the motion for a new trial.

The first error assigned and presented on this appeal is the order of the court overruling the motion for a continuance. The affidavit of the defendant for a continuance was based upon the absence of Douglass Fleming and Mattie Fleming, who it is stated reside at Des Moines in the state of Iowa; that the defendant had been in correspondence with said witnesses since about July 10, 1908, and that said witnesses up to Sept. 15, 1908, informed and advised the defendant, and he believed that they would be in attendance at this term of court to testify upon behalf of the defendant; but that on Sept. 15th the defendant received a communication from the said witnesses that Douglass Fleming was seriously ill and confined to his bed, and that he could not be in attendance at court; that the witness, Mattie Fleming, was in constant attendance and had the sole care of said Douglass Fleming and could not be spared from his bedside; that Douglass Fleming is a brother and Mattie Fleming a sister of the defendant, and that he could prove by such witnesses that from April, 1857, until December, 1861, the defendant was subject to and had spells of nervous prostration and fits resulting therefrom, and during such time was entirely unconscious of his acts and unable to distinguish the difference between rightful conduct and wrongful conduct, and was

unable to recollect after he became conscious anything he did
or said while under the influence of the same; that he could
not prove such facts by any other person.

As a further ground for such continuance the defendant
stated that he had been incarcerated in jail since the alleged
commission of the offense, and had no relations within the
state to aid or assist him in the preparation of his defense,
other than said witnesses and his wife, Amelia Fleming, who
was prostrated with nervous debility and enfeebled mental
condition so as to render her of no assistance to the defend-
ant in the preparation of his trial; and by reason of his con-
finement in jail and the absence of his relations he has been
unable to find witnesses whose existence he knows and who
can testify in his behalf; that during the year 1900 and 1901
and a part of 1902, while residing in Bingham county, state
of Idaho, a large portion of the time he was confined to his
bed by reason of nervous prostration, and that while so af-
flicted his mind became deranged to such an extent that he
was unable to transact any business or to remember any trans-
actions or the names of those with whom he was best ac-
quainted or to converse with his friends on any subject, and
at other times was entirely demented and bereft of his reason
and was taken into Boise City in the month of June, 1902, for
medical treatment; that the employees of the stock farm of
Burk brothers, who ranged stock upon the range in that
vicinity during those years, but whose names affiant does not
remember, knew of such facts and by whom he could prove
such facts, and that if the cause be continued until the next
term of court he will be able to ascertain the names of such
witnesses and produce them upon the trial; that he relied
upon his brother, and that the brother would have come had it
not been for sickness, and assisted him personally and finan-
cially to ascertain the whereabouts of said witnesses; that he
is broken in health, without money and with little or no avail-
able property, and unable to secure the presence of the wit-
nesses; that the application was not made for delay, etc.

The prosecuting attorney filed a counter-affidavit setting
forth the date of filing the information, the date of arraign-

ment, and that he was willing to stipulate that the witnesses mentioned in the affidavit of the defendant would testify, if present, to the facts as set forth in the affidavit of the defendant; that the defendant ever since the commission of the crime has been represented by counsel, and that a few hours after the commission of the crime John Peebles, Esq., of counsel for the defendant, was in communication with the prosecuting attorney concerning the fixing of the time for the preliminary examination; that at such hearing the defendant was represented by John C. Rogers and John Peebles, Esqs.; that the preliminary examination was held on July 17, 1908, more than two months before the information was filed; that the defendant had no subpoena or other process issued for any of said witnesses and consented to the setting of the case for trial without objection, and on Sept. 25th requested in open court that the prosecution place in his hands a list of witnesses that the prosecution would subpoena, whose names were on the information, that the defendant might subpoena such persons; that upon information and belief the defendant for two months has had in his possession money with which to pay counsel and to assist in his defense; that the witness, Douglass Fleming, brother of defendant, has been ill for more than a year, and that his disease and condition is such that it is unlikely at any time in the future he will be able to make the trip from Iowa to Idaho by reason of his age and infirmity.

We have thus set out to some extent the material allegations contained in the affidavit filed by the defendant, as well as the affidavit made by the prosecuting attorney upon the hearing of the motion for a continuance. We have deemed this necessary in view of the argument urged by counsel for the defendant, to the effect that it is a recognized rule by the courts generally that in important criminal cases a continuance at the first term is granted with great liberality, and that the same exactness of showing is not required as in cases of less importance or when application for such continuance is made at a subsequent term after the filing of the information.

It is a rule in this state, followed and approved by all of the decisions of this court dealing with the subject, that a motion for a continuance is addressed to the sound discretion of the trial court, and his ruling thereon will not be disturbed on appeal unless it appears there has been an abuse of such discretion. (*Herron v. Jury*, 1 Ida. 164; *Cox v. Northwestern Stage Co.*, 1 Ida. 376; *People v. Walter*, 1 Ida. 386; *Lillienthal v. Anderson*, 1 Ida. 673; *State v. Gordon*, 5 Ida. 297, 48 Pac. 1061; *State v. St. Clair*, 6 Ida. 109, 53 Pac. 1; *Holt v. Gridley*, 7 Ida. 416, 63 Pac. 188; *Reynolds v. Corbus*, 7 Ida. 481, 63 Pac. 884; *State v. Rice*, 7 Ida. 762, 66 Pac. 87; *Robertson v. Moore*, 10 Ida. 115, 77 Pac. 218; *Richardson v. Ruddy*, 10 Ida. 151, 77 Pac. 972; *State v. Wetter*, 11 Ida. 433, 83 Pac. 341; *Rankin v. Caldwell*, 15 Ida. 625, 99 Pac. 108; *Storer v. Heitfeld, ante*, p. 113, 105 Pac. 55.)

It appears from the record, and the showing is made upon the motion for a continuance, that the prosecuting attorney will admit that if the witnesses mentioned in the defendant's affidavit were present, they would testify to the facts as therein stated. Sec. 4372, Rev. Codes, provides:

"A motion to postpone a trial on the ground of the absence of evidence can only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it. The court may also require the moving party to state, upon affidavit, the evidence which he expects to obtain; and if the adverse party thereupon admit that such evidence would be given, and that it be considered as actually given on the trial, or offered and overruled as improper, the trial must not be postponed."

This section was construed by this court in the case of *Territory v. Guthrie*, 2 Ida. 432, 17 Pac. 39, and held to apply to an application for a continuance in a criminal case; and that where a party makes the admission that the witnesses named in the affidavit if present would testify as therein stated, the affidavit becomes evidence and it is not error to overrule an application for a continuance. This case was approved by this court in the case of *State v. St. Clair, supra.* But counsel for the defendant argues that under the showing

made the defendant did not have time to prepare for trial. The record, however, shows that the defendant was represented by counsel soon after his arrest and at all stages of the proceedings; that the case was set for trial by consent of counsel without objection, and no intimation given or made that the defendant would be unable to prepare his defense and be ready for trial at the time the case was set. According to his own showing, he had present at such trial the evidence of all witnesses he discloses were necessary or whom he desired.

A defendant charged with a crime is required, under the statute of this state, to exercise some diligence in preparing his defense; and where it appears that he has not been deprived of any of his legal rights in the preparation of his case for trial, and that full opportunity has been given him to prepare his defense, it is not an abuse of discretion to deny the application for a continuance. The time for preparing for trial in this case was much longer than that set forth in the case of *State v. Rice, supra,* in which this court held that the trial court did not abuse its discretion in denying an application for a continuance upon the ground that the defendant did not have sufficient time to prepare for trial.

In the case of *State v. Wetter, supra,* this court had an occasion to review the showing made upon an application for a continuance, where the facts were very similar but much weaker than the case at bar, and in which it was held that the trial court did not abuse its discretion in overruling the application for a continuance. In this case the defendant was permitted to introduce as evidence the statement which defendant claims would be made by his brother and sister residing in Iowa. The personal attendance of these two witnesses could not be compelled, and if their depositions had been taken it probably would not have had any greater influence with the jury than the statement made by the defendant as to what such witnesses would testify to. In other words, the defendant would not have had the advantage of the personal attendance of such witnesses — and not only that—but, under the showing made in this case, it does not ap-

pear that even if a continuance had been granted the defend-
ant would have been able to secure the attendance of such
witnesses at the next term of court. As to the other wit-
nesses referred to in the affidavit, their names are not given,
their whereabouts are not shown, and there is nothing in the
affidavit from which the court can conclude that the defend-
ant would ever have been able to secure any witnesses who
would testify as claimed by him in his affidavit. Notwith-
standing that fact, he is accorded the full benefit as evidence
of all that he claims such witnesses would testify to if pres-
ent. Under the statute of this state and the decisions of
this court, no distinction is drawn as to the showing required
whether the application be made at the first or a later term
after the indictment is returned, or the information filed.
Such fact, however, is proper to be taken into consideration
by the trial court in determining the question as to whether
there has been due diligence exercised by the defendant in
preparing his case for trial, and is proper to be considered
by this court in determining whether the trial court abused
the discretion vested in it in refusing a continuance. But, un-
der the statute, the defendant is not entitled to a continuance
as a matter of right when application is made at the term at
which the indictment is returned or the information filed,
unless the statutory showing is made.

It is further argued by counsel for appellant that the trial
court should have taken into consideration, in passing upon
the application for a continuance, the fact that there was
considerable excitement in the vicinity of the alleged homi-
cide and that public sentiment was clearly against the defend-
ant; and that these matters should have influenced the court
in granting a postponement of the trial. An examination of
the affidavits filed on motion for a continuance does not dis-
close the contention made by counsel for appellant. It does
not appear from the showing made that there was any ex-
citement in the vicinity of the alleged homicide or that public
sentiment was against or in favor of the defendant, or that
the defendant could not have had as fair a trial at such term
of court as at any subsequent term.

It is also contended by counsel for appellant that, inasmuch as the defense was insanity, more time was required by counsel to investigate the facts and prepare such case for trial; but from the showing made it does not appear that any more time would have been required to prepare the defense of insanity than any other defense. It is also contended that the fact that the prosecution admitted that if the witnesses named in the affidavit for a continuance were present they would have testified as therein stated, did not give to the defendant the full weight and effect that the evidence of such witnesses would have had with the jury if personally present; and that this is especially true where the defense is insanity. While it may be conceded, as a general proposition, that a jury is in a better position and better able to determine the truth or falsity of a witness' statement if the witness be present in court, still where the statute provides and the prosecution admits that if the witnesses named in the affidavit be present they would testify to the facts therein stated, the defendant is not in a position to contend that he is denied a constitutional right. It is the common knowledge of those experienced in the conduct of trials that there are cases in which more credence would be placed in the statement of a witness were it made upon paper, rather than in person; and that the conduct and demeanor of a witness sometimes would lead a jury to disbelieve the statements made by such witness rather than believe such statements, and that the rule is not always in favor of the contention that the testimony given will have greater weight if given in person. After a careful examination of the showing made in this case we are unable to say that the trial court abused its discretion in overruling the application for a continuance.

It is next urged that the trial court erred in refusing to give the following instruction requested by the defendant:

"The jury are instructed that if, from the evidence, they have any reasonable doubt as to whether the defendant, John Fleming, at the time of firing of the fatal shot, was under reasonable and honest fear that said deceased intended and was about to inflict upon him great bodily harm, and that

he fired the shot under that belief and in self-defense, then the jury must acquit the defendant.''

The trial court refused this instruction for the reason, as shown by the indorsement thereon, that there was no evidence to justify the giving of such instruction. If this instruction is not a correct statement of the law, then the court did not err in refusing to give the same, and the reason upon which such refusal was based is of no consequence. We are satisfied that this instruction is not a correct statement of the law of self-defense.

Sec. 6570, Rev. Codes, is as follows:

''Homicide is also justifiable when committed by any person in either of the following cases: . . . . 2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or, 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.''

It will thus be seen that under the provisions of this statute the bare fear of the commission of any of the offenses mentioned in subds. 2 and 3, to prevent which homicide may be lawfully committed, is not sufficient to justify it, but the circumstances must be sufficient to excite the fears of a reasonable person; and the party killing must have acted under the influence of such fears alone. When, therefore, the defendant requested the court to instruct the jury that if from the evidence they had a ''reasonable doubt as to whether the defendant, John Fleming, at the time of firing of the fatal

shot, was under reasonable and honest fear that said deceased intended and was about to inflict upon him great bodily harm, and that he fired the shot under that belief and in self-defense, then the jury must acquit the defendant,'' such instruction omitted one of the essential requirements of the statute, which is, not only that the defendant, acting on the appearances, himself believed that he was in danger, but also, would a reasonable man situated as the defendant was, seeing what he saw and knowing what he knew, be justified in believing himself in imminent danger; that is, were the circumstances sufficient to excite the fears of a reasonable person, and did the defendant, acting under that influence alone, commit the offense charged?

As was said by the supreme court of California in the case of *People v. Glover,* 141 Cal. 233, 74 Pac. 745:

''A person may have a lively apprehension that he is in imminent danger, and believe that his apprehension is based on sufficient cause and supported by reasonable grounds; that such apprehension is reasonable and warranted from appearances as they present themselves to him. If, however, he acts on these appearances, he does so at his peril, because the law leaves it to no man to be the exclusive judge of the reasonableness of the appearances upon which he acts, but prescribes a standard of its own, which is, not only did the person acting on the appearances himself believe that he was in deadly peril, but would a reasonable man, situated as the defendant was, seeing what he saw, and knowing what he knew, be justified in believing himself in danger.'' (*People v. Lynch,* 101 Cal. 229, 35 Pac. 860; 21 Cyc. 817.)

Looking at the instruction under consideration again, we find that the instruction leaves the question of fear entirely to the ''reasonable and honest belief of the defendant,'' not as a ''reasonable man'' as the statute says, but entirely to his own judgment and conclusion, and entirely ignores an essential element required in order to constitute self-defense. We find no error in the court's refusal to give this instruction. (*State v. McGreevey, ante,* p. 453, 105 Pac. 1047.)

The next error relied upon by counsel for appellant was the refusal of the trial court to give the following instruction: ''The court instructs the jury that the policy of our law deems it better that many guilty persons should escape than that one innocent person should be convicted and punished; so that unless the jury, after careful and thorough consideration of all the evidence in the case, can say and feel that every material allegation in the information is proven beyond a reasonable doubt, the jury should find the defendant not guilty and acquit him.''

The first part of this instruction with reference to the policy of the law is argumentative and should not have been given to the jury. (*Smith v. State*, 141 Ala. 59, 37 So. 423.) The latter part of the instruction, as to the jury being satisfied that every material allegation in the information was proven beyond a reasonable doubt, was fully and completely covered by the instructions given with reference to the presumption of innocence and the necessity for the state proving every material allegation of the information beyond a reasonable doubt, and the instructions defining reasonable doubt.

The third error assigned was the refusal of the court to give the following instruction: ''The jury are instructed that evidence of confession or admission should always be carefully scrutinized by the jury and received with great caution. It is the most dangerous evidence that can be admitted in a court of justice and the most liable to abuse; and though a witness is perfectly honest, it is impossible for him in most cases to give the exact words in which an admission was made, and sometimes by the transposition of the words a party may give a meaning entirely different from that which was intended to be conveyed by the witness.'' The court did give, however, the following instruction: ''The jury are instructed that evidence of confession or admission should be carefully scrutinized by the jury and received with great caution; though a witness is perfectly honest, it is impossible for him in most cases to give the exact words in which any admission was made; and sometimes by the transposition of

the words a party may find a meaning entirely different from that which was intended to be conveyed by the witness.'' No exception was taken to the giving of this instruction; the only difference between the instruction requested and the instruction given is that the latter omits from the former the following language: ''It is the most dangerous evidence that can be admitted in a court of justice and most liable to abuse.'' The court did not err in striking out and omitting this part of the instruction. By giving an instruction to the jury containing this language, the court would clearly have invaded the province of the jury. It is the province of a jury to determine the weight to be given to evidence, and it is not within the province of the court to say to the jury that any particular fact or species of evidence is dangerous evidence or of doubtful character or is entitled to more or less weight than some other fact or species of evidence. The jury alone must determine what weight will be given to any fact appearing in evidence or any species of evidence. Whether admissions are a dangerous character of evidence and liable to abuse is a matter which counsel may argue to the jury for the purpose of showing to the jury that a fact has not or has been established; but when the court says to the jury that certain evidence, whether it be an admission or the oral evidence given by some particular individual, is of a dangerous character, and liable to abuse or to be false, the court then clearly invades the province of the jury. When the court told the jury that evidence of admissions should be received with great caution, and that although a witness is perfectly honest, it is impossible for him in most cases to give the exact words in which any admission was made, the court gave to the jury the most favorable expression upon the subject of admissions and their effect which the defendant could · ask. (*Woollen v. Whitacre*, 91 Ind. 502; *Lewis v. Christie*, 99 Ind. 377.)

It is next contended that the court erred in refusing to give the following instruction: ''The jury are instructed that the statements of the defendant out of court are a very doubtful species of evidence and should be acted upon with great caution; and unless supported by other evidence tending to show

that the prisoner is guilty of the crime charged, *are sufficient to warrant a conviction."* There was no error in refusing to give this instruction. There was evidently a mistake in writing the word "sufficient" instead of "insufficient," and for this reason alone the court was justified in refusing to give the instruction, as it was not a correct statement of the law.

It is next urged that the court erred in refusing to give the following instruction: "The jury are instructed that it would be highly improper and wrong for them to regard any statements of the prosecuting attorney that are not based on the evidence in the case, if any such has been made, as entitled to any weight whatever in this case." This instruction stated a correct principle but was covered by the instructions given.

It is next contended that the court erred in refusing to give the following instruction: "The court further instructs the jury that this is not a civil case, but it is a criminal prosecution, and that the rules as to the amount of evidence in this case are different from those in a civil case, and a mere preponderance of the evidence would not warrant the jury in finding the defendant guilty. But before the jury can convict the defendant, they must be satisfied of the defendant's guilt beyond all reasonable doubt, and unless so satisfied the jury should find the defendant not guilty." This instruction was fully covered in so far as it was applicable by instructions given by the court. The court very fully and completely instructed the jury that it was the duty of the jury to commence the investigation of the case with the presumption that the defendant was innocent of the crime with which he was charged and to enter upon the consideration of every fact and circumstance in evidence, having in mind the presumption of innocence, and that such presumption should apply to every fact and circumstance, and was not an idle form but a fundamental and important part of the law; and that the jury should act upon this presumption throughout the consideration of the evidence until it should be overcome by proof of guilt, so strong, credible and conclusive and beyond any reasonable doubt that the defendant was guilty. Then follows

a definition of "reasonable doubt." The court thus advised
the jury of the degree of proof required before they could
convict and the instruction contains every pertinent element
found in the requested instruction.

Complaint is also made of the refusal of the court to give
instructions 10 and 11. We have carefully examined these
instructions and find that they were covered by instructions
given by the court on his own motion; and it could avail
nothing by a discussion and comparison of such instructions.

It is contended that the trial court erred in refusing to
give a certain instruction requested by the defendant on the
law of insanity, and also erred in giving the latter part of
instruction No. 21 given by the court on its own motion upon
the subject of insanity. No exception was taken to the re-
fusal of the court in giving the instruction requested by the
defendant, and for this reason error cannot be urged in this
court. The instructions given by the court on the subject of
insanity are very full and complete, and in our opinion gave
the law correctly to the jury. One of these instructions, em-
bracing the alleged objectionable matter, was as follows:

"Should you first find that the defendant fired the fatal
shot, then the court instructs you, gentlemen, that the true
test and standard of accountability is: Had the defendant
sufficient mental capacity to appreciate the character and
quality of his acts? Did he know and understand that it was
in violation of the rights of another and in itself wrong?
Did he know that it was prohibited by the laws of the state
and that its commission would entail punishment and penalty
upon himself? If he had the capacity thus to appreciate the
character and comprehend the possible or probable conse-
quences of his acts, he is responsible to the law for the acts
thus committed and is to be adjudged accordingly. *A per-
son in the possession of a sound mind who commits a criminal
act under the impulse of passion or revenge, which may tem-
porarily dethrone reason, or for the time being control his
will, cannot be shielded from the consequences of his act.*"

The portion of the instruction above printed in italics is
that to which counsel for defendant takes exception, counsel

contending that if a man, who is sane on a given day, becomes insane—whether it is a year or a day, an hour or a minute afterward—and his insanity is of such a type as to prevent him from distinguishing the right from the wrong, he is insane within the meaning of the law and of the decisions, no matter what the predisposing cause of such insanity was. This argument of counsel does not apply to the instruction, and is not a reason why the portion of the instruction objected to, when taken in connection with the remainder of the instruction, does not state the law correctly. It will be observed that the portion of the instruction objected to starts out with the statement that "A person in the possession of a sound mind who commits an act," etc., and not "a person who has at some previous time been insane or incapable of distinguishing right from wrong."

We take it to be the law that a person in the possession of a sound mind and whose reason is temporarily dethroned under the influence of passion or revenge alone, who while in such condition commits a crime, cannot be shielded from the consequences of his act upon the ground that he was not mentally responsible. If this were not the law, then every crime committed under the influence of passion or revenge would go unpunished, for it may be conceded as an inevitable conclusion that if a crime is committed under the influence of passion or revenge the person's mind to a certain extent is temporarily dethroned and is acting without direction of reason; yet this fact is not an excuse for the commission of a criminal act when in this condition. If this were the law, then very little difficulty would be encountered in successfully defending all criminal acts committed under the influence of passion or revenge, upon the ground that the person committing such offense was not mentally responsible for his acts. (*State v. Larkins*, 5 Ida. 200, 47 Pac. 945; *State v. Erb*, 74 Mo. 199; *State v. Pagels*, 92 Mo. 300, 4 S. W. 931; *State v. Harrison*, 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224; *State v. Privitt*, 175 Mo. 207, 75 S. W. 457; 2 Brickwood-Sackett Instructions, sec. 2580.)

It is next argued by counsel for appellant that the evidence is insufficient to justify the verdict. This contention of counsel is based upon the claim that the evidence does not show deliberation, premeditation or malice; that no motive is shown; that the evidence taken as a whole shows that the deceased at the time of the affray was actuated by a feeling of ill-will, hostility and animosity against the defendant, and that the defendant bore no such feeling toward the deceased; that the evidence fails to show that at the time of the killing the defendant was in such mental condition as to make him irresponsible for his acts.

There is no substantial conflict in the evidence. Langford was seen driving away from his home in an easterly direction on the morning of July 8, 1908; he was seen in the evening about 6 o'clock returning home, and stopped at a neighbor's place and watered his horses. Shortly after that a gunshot was heard and Langford's team was seen running in the road and ran to his place of residence. Langford's dead body was found immediately thereafter about thirty feet from Fleming's fence and ten feet off the beaten road. Indications showed that the wagon had turned from the beaten track in the road, seventy or eighty feet from where the body lay, and that the body had been dragged a short distance and that the wagon wheels had passed over the body. There were no indications found, or any evidence in the neighborhood of where the dead body was found or any place thereabout, of any struggle or contest in any way between the defendant and the deceased, or that Langford's team had stopped. There was a main lateral ditch running inside of Fleming's field, and near this there were indications that a person wearing gum-boots had been standing near the ditch and also had been sitting down, and a knee print was also found in the dirt. The ground was wet and the alfalfa very tall and had not been cut. Examination was made up and down the ditch from where these tracks were found for a distance of seventy-five yards, and no indications were found that the tracks had crossed the ditch in the direction of the road. Evidence was further found showing tracks

leading from the direction of Fleming's house to the spot near the ditch where they were found and also leading from such place back in the direction of Fleming's house; that Fleming was seen to wear gum-boots on that day and a few days previous; that the place where the tracks were seen in the field was about one hundred and ten feet from where Langford's wagon had left the road; that there were no indications in the road that the team had stopped, but the wagon tracks showed that the team had swerved from the road and then came back into the road; that there were no footprints in the road or near where the body of Langford was found; that shortly after that Fleming called to a neighbor in the field and told him that he had shot Frank Langford, and stated to the neighbor, "I am going to quit for a while," and when asked what was wrong said, "I have killed Langford." He said: "Langford was going to whip me again for letting some water run in to the borrow-pit. I had to do it." He told this neighbor that he was going to Titus' to get Titus to carry him to town and give himself up. He did not have his working clothes on. When he appeared at Titus' he told him and said he had quit irrigating, and when asked what he had done, said he had killed Frank Langford and that he would like to go over to town and give himself up. He went to town with this neighbor and surrendered himself to the marshal at Rupert, and stated in a hotel at Rupert that he shot and killed a man and had come to town to give himself up.

An examination of the body of the deceased the day after his death disclosed a bullet wound entering the front of the chest and passing upward and downward, the point of exit being some two inches lower than the point of entrance and the wound of such a character as to cause death. Evidence was also offered showing previous difficulty and a personal encounter between the deceased and the defendant about a year prior to the killing, and that Fleming had made threats against the deceased. Shortly after the killing a rifle was found in Fleming's house with mud on the butt of the gun and a bullet taken therefrom was of the size and character

of the bullet taken from Langford's body and was estimated
to be about the same size. An examination of the body of
the deceased disclosed that he was unarmed except that a
pocket-knife was found upon his person, and no weapons of
any kind were found in the deceased's wagon or in or about
the premises where the killing took place.

Will this evidence support a verdict of murder in the first
degree? Sec. 6560, Rev. Codes, defines murder as follows:
"Murder is the unlawful killing of a human being, with
malice aforethought." The following section provides:
"Such malice may be express or implied. It is express when
there is manifested a deliberate intention, unlawfully to take
away the life of a fellow-creature. It is implied, when no
considerable provocation appears, or when the circumstances
attending the killing show an abandoned and malignant
heart." The following section defines murder of the first
degree as "All murder which is perpetrated by means of
poison, or lying in wait, torture, or by any other kind of
wilful, deliberate, and premeditated killing, . . . . is mur-
der of the first degree."

Applying the statute to this evidence, we find, first, that
the killing is confessed. If this evidence shows a deliberate
intention unlawfully to take the life of the deceased, malice
is "express." If, however, the evidence shows no consider-
able provocation in the killing, or that the circumstances at-
tending the killing show an abandoned and malignant heart,
then malice is "implied." From this evidence we think the
jury were warranted in concluding that there was a delib-
erate intention on the part of the defendant to take the life
of the deceased, and that there was no considerable provoca-
tion for the killing. If so, then there was both express and
implied malice. The statute says: "All murder which is
perpetrated by means of lying in wait, or by any other kind
of wilful, deliberate, and premeditated killing, is murder of
the first degree." The evidence in this case shows a state of
facts from which the jury would have been justified in con-
cluding that the defendant was lying in wait and shot the
deceased from this position; or, that the defendant wilfully,

deliberately, and premeditatedly placed himself in a position and waited for an opportunity to shoot and kill the deceased. In either of these cases, the murder would be of the first degree, and to our minds clearly shows the unlawful, wilful, deliberate, and premeditated killing with malice aforethought.

It is contended by counsel for appellant that the evidence does not show that the defendant did not act in self-defense and for his own preservation in taking the life of the deceased. There is nothing in the evidence which would have justified the jury in concluding that the defendant did act in self-defense. To our minds, the evidence clearly shows that the defendant killed the deceased deliberately and with malice and with the purpose and intent of taking the life of the deceased. There are no mitigating circumstances whatever, no acts which in any way would tend to justify the killing. The killing appears to have been done without any excuse or reason whatever, and the evidence fully warranted the verdict of the jury, unless the defendant was not in such a mental condition as to make him responsible for his acts, and this leads to the next contention made by the appellant and that is: Was the defendant mentally responsible for his acts at the time of the killing; in other words, was he sane?

The defendant introduced professional and expert witnesses who gave evidence tending to show that the defendant was suffering from paranoea and at the time of such examination was not responsible for his acts. The evidence of these experts further showed that there might be lucid periods when the defendant would be able to distinguish right from wrong and that at other times he would not be able to so distinguish. The wife of the defendant also testified and detailed certain mental disturbances the defendant had experienced and his queer and unusual actions at such time; and this was met upon the part of the prosecution by expert testimony and by the testimony of a large number of the defendant's neighbors and acquaintances who were personally acquainted with him, had business relations, and associated intimately with him, and who gave the opinion that he was sane and accountable for his acts. Upon this evidence the

court submitted to the jury the sanity of the defendant under appropriate and full instructions, giving to the jury the law governing such matters, and by their verdict the jury have found that at the time the homicide is alleged to have been committed the defendant was sane and able to distinguish right from wrong acts and was responsible for his acts; and with the conflict in the evidence disclosed by the record, we do not find that the evidence is insufficient to support the verdict of the jury.

There are a number of circumstances surrounding the commission of the crime charged which we have not attempted to set out in detail but which no doubt were given much weight by the jury; and the acts and movements of the defendant before and after the killing no doubt were suggestive to the jury that a person would not pursue the course taken by the defendant unless he was conscious of his own wrongdoing, and was able to distinguish that by his acts he had clearly transgressed the laws of his state and was willing to surrender himself to answer therefor; and to our minds, the evidence of sanity preponderates and outweighs the professional testimony of the expert as to his opinion based upon certain evidences he discovered from an examination of the defendant. The evidence of these professional witnesses is interesting, and evidences great learning in their profession, yet in each instance they base their opinion of the witness' mental condition at the time of the homicide upon his condition after and long prior to the homicide, and from these facts they reason and conclude that at the time of the homicide he was not mentally responsible for his acts. While insanity is a legitimate defense, and no one should be punished who is not mentally responsible for his acts, yet before this court would be justified in disturbing the verdict of a jury where insanity is claimed as a defense, it must appear from the evidence that a reasonable and fair doubt necessarily will arise out of the evidence as to the sanity of the defendant. In this case we believe the evidence supports the verdict of the jury.

A number of errors have been assigned based upon the ruling of the trial court in sustaining and overruling objections to evidence. We have carefully examined all of these objections and do not find any prejudicial error in the ruling of the trial court. A motion for a new trial was made. Affidavits were filed by the defense in support of such motion. The prosecution filed counter-affidavits and the defense made a motion to strike such counter-affidavits from the files. This motion was overruled and the ruling of the court is assigned as error. This contention of counsel for appellant is based upon the provisions of Rev. Codes, sec. 7952, subd. 7, reading as follows:

"When new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing in support thereof the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable."

Inasmuch as this statute makes no provision for filing counter-affidavits by the state, counsel for appellant contends that the affidavits filed in this case should have been stricken from the files and not considered by the trial court, and that the court committed error in not sustaining the motion to strike. Counsel for appellant contends that Rev. Codes, sec. 4441, subd. 1, in relation to motions for new trials in civil cases, specifically provides for filing counter-affidavits, and that had the legislature intended to allow counter-affidavits on motions for new trial in criminal cases, the statute would have so provided.

While this court has never had occasion to pass upon this question directly, yet it has in several instances recognized the right to file counter-affidavits by the state. (*State v. Davis,* 6 Ida. 159, 53 Pac. 678; *State v. Levy,* 9 Ida. 483, 75 Pac. 227.) The statute of California with reference to filing

affidavits on motion for a new trial in a criminal case is identical with that of the statute of this state. In *People v. Sing Yow*, 145 Cal. 1, 78 Pac. 235, this precise question was considered and the court said:

"We are of the opinion that the court did not err in receiving these affidavits, or in taking them into consideration in determining the question as to whether a new trial should be granted. To hold otherwise would be to make it necessary for the trial court in many cases to grant a new trial upon the *ex parte* affidavits of perjured witnesses, where it is easily within the power of the other side to demonstrate that the new witnesses are utterly unworthy of credit, and that the allegations of their affidavits are entirely without foundation, and can be overwhelmingly overcome by the evidence of reputable persons. . . . . Such counter-affidavits are received and considered, as has been said by some courts, simply for the purpose of enabling the trial court to intelligently exercise the discretionary power confided to it of determining whether or not the interests of justice demand that a new trial should be had."

To the same effect, *People v. Fice*, 97 Cal. 459, 32 Pac. 531; *People v. Woon Tuck Wo*, 120 Cal. 294, 52 Pac. 833.

A motion for a new trial upon the ground of newly discovered evidence is addressed to the sound legal discretion of the trial court, and the important question the trial court is called upon to decide is, would such newly discovered evidence, if produced upon another trial, render a different result reasonably probable; and in the absence of such evidence did the defendant have a fair trial on the merits; and while upon the hearing of a motion for a new trial the court cannot retry the case upon its merits upon affidavits and counter-affidavits, yet the court can permit counter-affidavits to be filed, and may consider the same in relation to any pertinent matter except the issue of fact to which such newly discovered evidence is addressed. In other words, the prosecution may file counter-affidavits for the purpose of showing that the newly discovered evidence claimed by the state does not exist, or that the same is unworthy of consideration or be-

lief, or that proper diligence was not exercised in producing such evidence at the former trial; and the court may consider such counter-affidavits in connection with the affidavits filed by the state for the purpose of determining the relevancy and importance of such alleged newly discovered evidence, and whether such evidence if true would in all probability lead to a different result upon a retrial of such case. The counter-affidavits to which the motion to strike was addressed fall clearly within the rule above announced, and the trial court committed no error in refusing to strike them from the files.

A motion for a new trial was made and overruled and this ruling is assigned as error. The motion for a new trial was based upon newly discovered evidence and is supported by certain affidavits. The defendant filed affidavits separately made by Drs. W. B. Lyman, J. L. Stewart and John Boeck, all physicians, in which each states that he examined the defendant on Mar. 29, 1909, and found the defendant suffering from chronic, delusional insanity to such an extent that he was unable to place himself in a sane relation with his environments, and unable to comprehend the full nature and extent of his acts and the import of his social relations, and unable to distinguish between right and wrong in connection with his acts; and that such condition, in the opinion of the physicians making the affidavits, has existed for many years and is incurable. These affidavits in the main relate to the condition of the defendant at the time the examination was made, and the opinion is given that such condition has existed for many years; but it does not appear that at the time the homicide was committed the defendant was acting under any delusion, or was mentally unable to distinguish between right and wrong, or unable to comprehend the nature or quality of his act at the time he fired the shot which took the life of the deceased. This can be determined only by a process of reasoning.

Doctor Boeck, who makes one of the affidavits used, was a witness at the trial, and carefully and fully testified with reference to the defendant's mental condition at that time; and the affidavits of Drs. Stewart and Lyman only relate to

the defendant's condition at the time the examination was made on Mar. 29th. At most, the evidence of these witnesses would be cumulative.

The defendant also filed an affidavit made by one C. E. Byrum, in which Byrum makes the statement that in a conversation once had with Langford with reference to his trouble with Fleming, Langford stated: "I will tell you, Byrum, I am going to agitate the old man until he makes a crooked move and then I am going to get the damned old son-of-a-bitch's hide." This statement is alleged to have been made in May, 1908. Even though this evidence were given upon the trial it would not have justified or excused the defendant in taking the life of the deceased, and would not have supported or tended to prove that the homicide was committed by the defendant in self-defense. It will be observed that the statement is claimed to have been made some two months before the homicide, and does not relate to the incidents surrounding the difficulty at the time the homicide was committed, and it would not have aided the jury in concluding that the act of the defendant was done in self-defense.

The defendant also filed affidavits made by Giles G. Titus and Chester Titus, in which Giles Titus makes the statement that on the morning after the killing, at about 125 feet south of where Langford's body lay and about ten feet from the wagon tracks made by Langford's wagon turning out of the road, he saw a pair of gloves lying on the ground about a foot apart; that he picked them up and examined them and they were driving gloves belonging to Fleming; that he had seen Fleming wear them, and that his brother told him that he had seen the gloves. Chester Titus states that he and his brother in law, W. W. Pittinger, went to the place where Langford was killed, and that George Montgomery, Sr., joined them, and at about 125 feet south, where the wagon had left the road, and on the west side of the wagon tracks where the team had turned off, he found a pair of driving gloves about a foot apart; that he picked one up and laid it down again in about the same place; that he did not know

whose gloves they were; that this was about three-quarters of an hour after the killing was done; that next morning in company with Giles Titus and George Montgomery, Sr., he went to where the gloves were and looked at them and they did not appear to have been disturbed, and that he took one of the gloves from where it was lying and kept it, and has it still, and that Giles Titus and Pittinger identified the gloves as belonging to Fleming, the defendant. George Montgomery, Sr., made an affidavit upon behalf of the state which was used on the motion for a new trial, in which he denies that on the morning following the killing in company with Giles Titus or any other person gloves were found, or that he saw any gloves lying in the road or any other place in the vicinity. It also appears from the affidavit of A. S. Abbott that he was present at the scene of the killing soon after, and that in company with Montgomery and others he examined the same ground where Titus claims to have found the gloves, and that they were not seen, and that on the following morning an investigation was again made and the gloves were not seen or found. This contradiction would leave the statement contained in the Titus affidavits very much in doubt, and especially is this true in view of the fact that Giles Titus was a witness for the prosecution upon the trial, and in no way referred to this incident of the gloves. It would seem that a matter of so much apparent importance as this would have suggested itself to his mind and counsel have been advised of the matter, and that he would have been interrogated with reference to such matter. But even if it be conceded that the gloves were found, still it could not upon any theory or possibility have influenced the jury in reaching a different verdict from that found.

An affidavit was also made by Walter Isbell to the effect that he was over in the Fleming field on the evening of the killing, and that he saw no tracks except where a man had walked down the field across to the fence; and Harry Blivens makes an affidavit that on July 8th he saw Fleming coming from water on Isbell's farm just across the road from Fleming's place; that the defendant had a plow and was near the ditch alongside the road and close to the place Langford was

killed, and stated that he was going to fix the levee of the ditch at that place, and that the ditch needed repair. Giles G. Titus also says in his affidavit that the levee of this ditch was not high enough to carry water, and Chester Titus says in his affidavit that he was on the scene of the killing the evening of July 8th and saw several men over in the Fleming field walking around and that the field was soft and that he saw Charles Vogan there.

These statements contained in these affidavits were no doubt intended to show that evidence could be produced disproving the evidence given by the state at the trial with reference to the tracks and conditions in the Fleming field indicating that the defendant was lying in wait at the time the homicide was committed. There is no reason or excuse why, if this evidence existed at the time of the trial, it was not produced, but if the witnesses did testify to these facts, still it would not disprove or throw doubt on the evidence of the state to the effect that tracks and imprints were found in the field. Not one of these witnesses say they made an examination and did not find such tracks or imprints. The statements contained in the affidavits are mere incidents from which it is left to inference that the tracks and imprints described by the witnesses for the prosecution were not there. As an excuse for not producing these witnesses, an affidavit was filed by the defendant and also his counsel, John M. Peebles, to the effect that they did not know of the existence of this evidence until after the trial, and were not aware that they could have proven such facts by the witnesses; and defendant's counsel further makes affidavit to the effect that the defendant was without means to employ anyone to secure evidence or procure the attendance of witnesses. A counteraffidavit, however, is filed by the state, made by the deputy sheriff who had Fleming in charge, to the effect that Fleming received about Aug. 1, 1908, a check to the amount of about $250 or $300. It also appears from the affidavit of the sheriff that Fleming had money in the bank during his time in jail, but did not show any disposition to spend the same. From all the facts as they appear in the affidavits presented by the defendant on motion for a new trial, we are

well satisfied that if such evidence had been introduced upon the trial or was introduced in a retrial of said case, a different verdict could not have been reached. Not only that, but it clearly appears that due diligence has not been shown on the part of the defendant in an effort to secure such testimony or any part of the same. While it appears that some of such evidence might not have been procured, yet a large part of it could have been secured if an effort had been put forth on the part of the defendant and his counsel to secure the same.

There is one question which has not been alluded to, which counsel for defendant very earnestly urges is a sufficient ground for a reversal of this judgment. But an examination of the record discloses that counsel for defendant has permitted himself to become very much exercised over what appears to have been an unimportant and inconsequential matter in so far as it could possibly have affected the defendant's rights or in any way prejudiced the jury against him. The question to which we advert is the fact that during the progress of the trial and in the presence of the jury, the wife of the defendant was arrested upon a charge of insanity. There is nothing in the minutes of the proceedings of the trial showing the arrest of Amelia Fleming, the wife of the defendant, at any time. This matter is presented entirely by the affidavit of John M. Peebles, one of defendant's counsel; and in his affidavit he states that after the close of the evidence of the·prosecution and while he and his associate were consulting with Amelia Fleming, the wife of the defendant, Art Murray, the deputy sheriff of said county, walked into said courtroom and inside of the bar of said court and up to where counsel were holding consultation with Amelia Fleming, and, in the presence of counsel and the jury, grasped Mrs. Amelia Fleming by the arm and said, "Come with me"; that he was asked by counsel to leave Mrs. Fleming alone and advised that he could not take her and that she was needed in the courtroom; that there was considerable confusion, and the attention of the jury was directed to what was happening and during such confusion the court adjourned. If this arrest took place as thus stated,

counsel who makes this affidavit flagrantly failed to protect the interests of his client, and was derelict in his duty in not calling the court's attention to such fact; and if the arrest was so made, the court should have severely reprimanded the officer for his undue haste and misconduct. But we are unable to believe that this arrest was of the character or attracted the attention or was of the importance stated by counsel in this affidavit, and argued by counsel upon this appeal. It will thus be seen by this affidavit that the statement is made that court immediately adjourned, and it further appears that Mrs. Fleming was brought into court the following morning and remained there throughout the trial, and that counsel for defendant were given full opportunity to consult her with reference to any matter they desired.

A counter-affidavit was filed by the deputy sheriff making such arrest in which he says: "I went into the courtroom where the trial was going on; after telling Sheriff Jones that I had the warrant, I leaned over and whispered to Mrs. Amelia Fleming the words, 'I want to see you.' She replied, 'Wait till I talk to my attorneys.' She then leaned over and talked to J. C. Rogers, Esq., and J. M. Peebles, Esq., the attorneys defending her husband, and also consulted with John Fleming, her husband; neither of her attorneys asked me what the trouble was or in any way conversed or communicated with me. Neither did I grasp Mrs. Fleming by the arm; neither did I use the words 'come with me.' There was no confusion of any kind. Mrs. Fleming did not herself know what the trouble was till after I had taken her to the sheriff's office. There was nothing said or done to indicate to the jury that anything unusual had taken place. After court adjourned this said evening the said attorneys J. C. Rogers and J. M. Peebles came to the sheriff's office and inquired regarding what, if anything, had happened to Mrs. Fleming; that the same said evening as well as the next morning the said attorneys had the opportunity to consult with Mrs. Fleming and did consult with her. That she was not confined but was permitted the use of the sheriff's office, and was permitted to remain a portion of the time in the court-

room. . . . . After Mrs. Fleming's arrest she was permitted to remain in the courtroom during the remainder of the trial, and did do so, and constantly consulted with John Fleming.''

An affidavit was also filed by the prosecuting attorney which among other things said: ''When Mr. Murray came into the courtroom he simply leaned over and told Mrs. Fleming that he would like to speak to her. There was no interruption or confusion and the attention of the jury was not attracted to the matter. After conversing a few moments with her husband and attorneys she quietly left the room and the trial proceeded. Her attorneys did not tell Mr. Murray that he could not take her from the courtroom, as they did not know that any action had been taken until after the close of the trial that same evening, when they made inquiries and were told that a warrant had been served on Mrs. Fleming. The actions of Mrs. Fleming during the trial were so hostile that her neighbors, who were witnesses against her husband, were very much afraid of being injured.

''Since the trial of Fleming I have talked with several of the jurors who sat in the case and all of them have stated that they did not know that Mrs. Fleming was arrested upon the charge of insanity or any other charge, until after they had rendered their verdict and had been discharged from the case.''

If the facts were as stated in these affidavits, it does not appear that the defendant could in any way have been prejudiced by the arrest of Mrs. Fleming. There was nothing in the conduct of the deputy sheriff in arresting Mrs. Fleming which directed the jury's attention to the matter so that they could in any way have been prejudiced or influenced by such arrest. It does not appear that the jurors even knew that such arrest was made. While the prosecuting officer should be very cautious in the trial of a case not to inject or permit to be injected into the proceedings any fact or circumstance which would tend to influence or prejudice the jury against the defendant, except such as arises out of the evidence given and the defendant's conduct, and the court should carefully guard the proceedings and see that a fair trial is had, yet where some foreign or outside circumstance

does occur which could not, upon any reasonable theory, have prejudiced the rights of the defendant or influenced the jury in arriving at a verdict, it is not such misconduct as will warrant the granting of a new trial.

The granting of a new trial upon the ground of newly discovered evidence is largely a matter of discretion, in the exercise of which this court will not disturb the order of the trial court except in case of abuse clearly disclosed by the record. A new trial should not be granted in a case where the party has not shown due diligence in discovering and producing the evidence, nor where the evidence is purely cumulative or contradictory, nor unless the newly discovered evidence is such as to render a different result upon a retrial probable. To entitle the defendant to a new trial upon the ground of newly discovered evidence, it must appear from the affidavits presented that the new evidence is not cumulative merely, that it is such as to render a different verdict reasonably probable upon a retrial, and that the evidence could not with reasonable diligence have been discovered and produced at the trial. (*Flannagan v. Newberg,* 1 Ida. 78; *Knollin v. Jones,* 7 Ida. 466, 63 Pac. 638; *State v. Bond,* 12 Ida. 424, 86 Pac. 43; *State v. Williams,* 12 Ida. 483, 86 Pac. 53; *Hall v. Jensen,* 14 Ida. 165, 93 Pac. 962; *O'Rourke v. Vennekohl,* 104 Cal. 254, 37 Pac. 930; *People v. Demasters,* 109 Cal. 607, 42 Pac. 236; *People v. Chew Wing Gow,* 120 Cal. 298, 52 Pac. 657; *People v. Rushing,* 130 Cal. 449, 80 Am. St. 141, 62 Pac. 742; *Chalmers v. Sheehy,* 132 Cal. 459, 84 Am. St. 62, 64 Pac. 709.)

We have carefully and exhaustively examined the record in this case and are unable to discover any error of the trial court which would warrant a reversal of the judgment. The record in this case shows that the defendant committed a grave and serious offense without any justification whatever, and that he had a fair trial, and we believe that we can safely say, without even a doubt, that the verdict of the jury is supported by the evidence. The judgment is *affirmed.*

Sullivan, C. J., and Ailshie, J., concur.