## BOB LAND v. THE STATE.

*No. 644.   Decided April 13.*

1.  **Robbery—Defendant Compelled to Make Evidence Against Himself.**—On a trial for robbery, where defendant complained that he had been compelled to make testimony against himself, in that the sheriff, shortly after the robbery, had carried him before the witnesses for identification, and he further objected to the testimony of said witnesses, to the effect, that he was the party they had seen near the place of the robbery on the evening of and a short time before it occured, *Held*, it appearing that defendant had gone voluntarily with the sheriff, and that nothing was said or done at the time by any of the parties inducive to his identification, that the objection was without merit, and the evidence was admissible.

2.  **Same—Evidence—Declarations of Codefendant—Hearsay—Harmless Error.**—On a trial for robbery, where the court, over objection by defendant, permitted the sheriff, to testify, that a day or so after the robbery he had been told by a codefendant where the parties committing the robbery had secreted the masks and slickers worn by them at the time of the robbery, and that he had found the same in pursuance of the information, the objection being, that the declarations were hearsay, and made after the completion of the conspiracy, *Held*, that if the testimony was inadmissible, the error was harmless and without prejudice to defendant, in view of the legitimate evidence of said codefendant and other witnesses in regard to the slickers and masks, and the circumstances connected with the finding of the same.

3.  **Same—Postponement and Continuance—New Trial—Practice on Appeal.**—Where, on a trial for robbery, a witness for defendant was taken sick and went home, and defendant made a motion to postpone or continue the case for said witness, in which motion he stated the facts expected to be proved by said witness, which motion was overruled, and defendant again, after conviction, assigned said ruling as one of the grounds of his motion for a new trial, *Held*, that the court on appeal will not reverse a judgment on account of the refusal of a postponement or continuance, unless, in connection with the other evidence adduced on the trial, they are impressed with the conviction not merely that the defendant might probably have been prejudiced in his rights by such ruling, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted; and *Held, further*, that the evidence being amply sufficient to sustain the conviction, independent of the matters proposed to be proved by the absent witness, the motion for new trial was properly overruled.

4.  **Same—Evidence.**—An application for continuance for an absent witness is properly overruled, where it appears that the same facts could have been proved as original evidence by other witnesses.

5.  **Continuance—Bill of Exceptions.**—A bill of exceptions to the overruling of an application for continuance should show whether it is a first or second application. Following Arnold v. Hockney, 51 Texas, 46.

APPEAL from the Criminal District Court of Dallas.   Tried below before Hon. CHARLES F. CLINT.

This appeal is from a conviction for robbery, the punishment being assessed at a term of twenty-five years in the penitentiary.

A brief statement of the facts is as follows:   Defendant, Bob Land, was an ex-hackdriver, and lived in the city of Dallas.   Frank Daniel and Oscar Daniel, his brother, were the two parties who were robbed. They were farmers, and lived in the southern portion of Dallas County. They were robbed at Cedar Creek, on the Hutchins road, several miles

below the city of Dallas, as they were returning home, on Saturday, the 16th day of September, 1893, about 4 o'clock p. m., by two men, who had masks over their faces, and wore slickers, or ulsters. Frank and Oscar Daniel had brought two wagon loads of wheat for sale to the city of Dallas that morning. Frank Collins drove one of these wagons for them, and he states, that about half-past 12 o'clock the defendant came to the wagon yard and asked him if they had brought wheat to town, and from what part of the county they came, and what road they traveled in going back home. He told him that they had brought wheat to town, and that they would return home by way of the Hutchins road. Defendant told the witness he was not the man he was looking for, and went away.

Charles Miller testified, that about 1 p. m. defendant Land and another party passed him while he was watering his horse at the long bridge, on one of the roads leading from Dallas to Cedar Creek. Land was carrying a bundle wrapped in a newspaper.

Charles Hargrove, an expressman, also met them on the Hutchins road at about half-past 1 o'clock. He knew the defendant, Land.

Between 2 and 3 o'clock, two men came to the house of J. M. Gillock, and called for water. This was not very far from Cedar Creek.

Mrs. Ogden testified, that about 3 or 4 o'clock two men came to her house, which was about 100 yards from Cedar Creek, and asked for water; and she directed them to the well, which was in the horse lot, and that her little granddaughter, Jimmie Burton, was over at the well at the time, drawing water.

The two Daniel brothers testified, that the robbery took place just where the Hutchins road crosses Cedar Creek, on the bridge. That two men came out of the timber with six-shooters in their hands, and said to them, "We are highway robbers. Hold up your hands!" And said: "We want what money you've got." And they then searched, and took what money they had from them. The men had masks over their faces made of handkerchiefs, and also wore slickers, or black dusters. They took from Frank Daniel $2.35—all the money he had. [The prosecution in this case was for the robbery of Frank Daniel. It is not stated in the record how much they got from Oscar Daniel.] After the robbery, they told the parties to drive on rapidly, or they would kill them. They then saw the robbers run for a short distance, and go through a wire fence.

Mr. K. Hall, a witness for the State, testified, that he heard of the robbery on the day of its occurrence, about 5 o'clock, and thinking that the robbers would strike through the bottom for the city, he and Mr. Simpson went out in that direction and found tracks in the river bottom, which they followed some distance, and met a negro, who gave them the description of two men who had passed there. The next day (Sunday) they found these same tracks, or tracks of the same appearance, and they followed these tracks up into the city to an alley or narrow street near the cotton mills.

John Childers testified, that between 5 and 6 o'clock on Saturday evening, defendant, Bob Land, and another man passed his house, near the cotton mills, going up the street in the direction of Runey's saloon, which was some three or four hundred yards distant. Mrs. Childers, his wife, testified to the same facts.

Runey testified, that about 8 o'clock defendant Bob Land, whom he had known about five years, and another man whom he did not know, and whom he did not identify, came into his saloon and got some beer.

Sam Robinson, who was bartender at this saloon, and who waited upon the parties, testified to the same facts. He also knew the defendant Land, and described the other man who was with him; and testified, that his attention was called to a scar on his right hand. After leaving the saloon, these parties went up the street and got on a street car of the Belt line.

Rogers, driver of the car, testified to these two parties getting on his car. He did not know them. They were only on the car about four minutes, to the end of his line, and were the only passengers at the time. Heard one remark to the other, "Done pretty well to-day." Did not hear reply. The other said, "But not as expected." The other said, "May do better next week." Witness, in his testimony, said the defendant looked like one of the men; would not recognize the other man.

V. K. Jarrel testified, that he was at Runey's saloon on Saturday evening when the parties came into the saloon. He knew Bob Land, and said that he believed he would know the other man if he could see him. The State here had the codefendant Winfrey brought in, and the witness identified him, and said, "He is the man who was with Bob Land on Saturday."

Upon an affidavit filed by one of the Daniels, K. Hall and Mr. Jacoby arrested Bob Land, the defendant. On Monday Sheriff Cabell, with other officers, took Bob Land out, for the purposes of identification, to the neighborhood where the robbery occurred. Some of the parties who had seen the men on Saturday identified him as the man, while others testified, that they thought he was the man, though they were not certain.

Sheriff Cabell testified, that on Sunday morning, when he got back to the city, he found Land arrested. On Monday morning he took him across the river to Mrs. Ogden's and Gillock's, for identification. That on Monday he pursued his investigations still further, and these investigations resulted in the arrest of Tom Winfrey. That after the arrest of Winfrey, on Monday, he and Mr. Lewis, his deputy, went across the Trinity River, and found two slickers and two handkerchiefs under a log. The bundle was wrapped up in a newspaper.

Tom Winfrey testified as follows: "My name is Tom Winfrey. I met Bob Land Friday evening before the robbery, the 15th day of September, at the Windsor Hotel. He asked me to walk on South Lamar street to an implement house. He asked me if I had some

money.  I said I had a little.  He said he was broke, and wanted to get some money to buy a set of harness with to run a hack during the fair.  He said he would go out and hold some one up, and make a stake.  Told me of something he had done before and never been found out.  Said it was easy enough.  I told him I would see him the next day.  I went to his house the next day.  He showed me a couple of slickers and masks.  He said we would go out on the Hutchins road, out south of town.  I told him all right.  He told me to meet him at the Santa Fe depot at 1:30.  I met him there.  We went out the track to Ferd Heim's brewery.  We started out in the road, and a man came driving along in a buggy.  Bob said, 'Come in this saloon; that man knows me.'  When we came to the bridge we met a negro man.  He said, 'Good evening, Mr. Bob.  What is taking you over here?'  Bob said, 'I live over here.'  About one-fourth mile from the other end of the bridge we met a man driving an express wagon.  He spoke to Bob.  I said, 'We had better not do anything out here; everybody knows you.'  We went on and came to a house, and asked a lady for a drink of water.  She said, 'Go over to the well.'  We drew some water, but did not drink it; it was dirty.  We came to another house and asked for water.  She directed us to a well; we went over to the well.  There was a little girl drawing a bucket of water.  Bob said to her, 'You are not very stout.'  We drew water, and then went under the wire fence and stopped there.  Staid one and a half or two hours.  These two boys came along in a wagon driving a span of mules.  Before they came we put on the masks and dusters and went out on the bridge, and told them to stop.  Bob went on the right hand side.  I staid by the off mule.  He went around and went through the youngest first, and then the other.  We then came on back by the well and crossed up on the railroad.  Saw a man coming up the track, and went through the bottom, and there divided the money.  He gave me $6, my part.  We then crossed the river and went up and went in a saloon and bought a bottle of beer.  One of the parties in the saloon said, 'Bob, I want to see you a minute.'  They went into a back room.  We then got on a street car.  I got off at the postoffice, and went home.  [Witness is shown slickers and masks, and identifies them.]  Got the masks and dusters at Land's house on Saturday morning between 10 and 11.  When I went into the house Bob was in bed.  The masks and dusters were in a trunk.  His wife was in the house.  There were some pieces just like the masks lying around the room.  He told his wife to burn them.  She took them and put them in the stove.  We took off the masks and dusters about thirty or forty steps from the place of the robbery.  We went on running.  Went through a fence to go on the railroad.  Pulled mine off there.  Bob pulled his off further down.  Carried them on down to the river bottom.  Bob said he would go back next day and get them.''

Cross-examined: ''I am 24 years old.  At the time of this robbery I was boarding at Mrs. Sprague's, North Akard street.  I was not

doing anything. Had been working for the Dallas Electric Company for a year. I am the brother of the deputy sheriff, Dick Winfrey. I have been in the city of Dallas since August a year ago. Came from Brownwood. I was raised in Kentucky. There is no agreement at all between the State or county attorney and myself in regard to my testimony. I have no agreement with any of the State authorities that I am not to be prosecuted. I expect to be prosecuted for this crime. I was on the stand at the habeas corpus examination. Court notified me at that time that what I testified to would be used against me. I declined. I have not notified the officers at any time since then that I would testify. I said I was going to confess. Told it to the boys in jail. I had no conversation with the officers stating that I would testify. I have been before the grand jury. I had had no conversation up to the time I was brought up to the habeas corpus trial. This is the first time I ever spoke to the county attorney. Have had no conversation with Mr. Lawther. Never spoke to him before. Don't know Mr. Oeland or Crosby. I have never had any agreement with Cabell or his deputies. I can not explain why I was brought out here as a witness. The habeas corpus trial was before the bill was found. It was after the habeas corpus trial that I went before the grand jury. I went before the grand jury without any proposition from any one at all. I have been told that anything that I might say would be used against me on the trial. I am stating it now as a matter of duty. Don't expect any benefit. It was more than I could stand, and I concluded to tell all about it; it impressed my mind so. I believed they would convict me on my testimony. Never thought I could escape. I make this confession because my conscience was troubled. When I saw I would be convicted, I made up my mind to tell the whole thing as it was. I am now engaged in what I believe a conscientious discharge of duty. I am doing it as a matter of right and duty. I never thought of the consequences of this act until it was over. It was on Friday that this matter was first mentioned, in the afternoon about 2 or 3 o'clock. I was standing at the Windsor talking to some of the hack boys. Bob asked me to go look at a hack with him. That was the first time he spoke of the robbery. I told him that evening that I would see him again, at his house. Met him next morning between 10 and 11 o'clock. There was no one present. His wife left the room, and did not come back any more while I was there. That was the day the robbery was committed. I staid there about one hour. Mrs. Land saw the slickers and handkerchiefs. Bob told her to take the pieces and burn them up. She left the room. Mrs. Land did not say anything in regard to this matter. This occurred right when I first went in the room. There was nobody else there. I was not in the back yard at all. The little boy came in and asked for some clothes. Bob told him to go on out. He never heard anything of this conversation. I did not see Land's mother-in-law, Mrs. Kibbe. She was not there at that time on Friday. Mrs. Land did not hear any of this

conversation. The only conversation she heard was about burning up the pieces. We left the Santa Fe depot and went right up the track, and struck the road going across the river opposite Ferd Heim's brewery. Saw a man coming up driving in a buggy. We turned back and went in the saloon. Staid there about a minute. Do not know how long we had been gone from the depot. We walked straight out there; five or ten minutes, I would guess. Never saw the man in the buggy any more until we went out the gate and saw him on the bridge. We waited until we saw him drive on, and then we went on. We could not see clear across the bridge. Last saw that man near the further end of the bridge. I said we met a negro on the bridge, who spoke to Bob. Next saw a man driving an express wagon. Next went on to where we asked for water. Where we got water is not more than forty or fifty steps from that bridge, the place of the robbery. I asked for the water at two places. Have not learned the names of the parties. At the first place, I went to the door and knocked. At the second place, I believe Bob asked for water. At the first place, I went to the door. The lady came round the house. Bob was standing in the road outside the gate. This lady simply said, 'There is no water here; go over in that lot and get some out of that well.' I let the bucket down to draw some water; it wasn't good, and we went on. My impression is, that I called for the water at the old lady's house. Do not remember what I said to her. If I called for the water, that was all. During our conversation with this old lady she was sitting on the gallery, and we were standing in the road. Think there was a fence. We went on together. We went on, first to the well. I told Bob I did not think it would be a good place there to do the job. I was willing to quit and go back to town; was afraid to undertake it. When we left the scene of the robbery, we went through a pasture to the railroad. It is 200 or 300 yards from the road to the place of the robbery. We went right through the fence by the well. I tore my duster getting through the fence. It is not more than 100 yards from the dirt road to the railroad. The railroad is this side of the place of the robbery. We went down the railroad until we saw some one coming. Left the railroad for about fifty yards. Did not strike the same railroad any more. I am not acquainted with the roads out there. Crossed the second railroad on this side of the river. We divided the money at the river, before crossing it."

The following, among others, were mainly the errors relied upon in defendant's motion for a new trial, which was overruled:

"3. The court erred in his refusal to allow the State to proceed with the trial without the testimony of the witness Jimmie Burton, and in refusing and overruling defendant's motion to withdraw the case from the jury and continue the same on account of the sickness and absence of said witness, as set out in bill of exceptions.

"4. The court erred in his general charge to the jury, as set forth in defendant's bill of exceptions thereto.

"5. The court was in error in holding that it was legitimate to allow the sheriff to carry the defendant around to witnesses for the purpose of having him recognized and identified, and in refusing to exclude the testimony so obtained, as set out in bill of exceptions.

"7. The verdict of the jury was unsupported by the evidence, and contrary to the evidence. The only testimony or evidence connecting defendant with the crime charged was that of the witness Tom Winfrey, and there was no other evidence tending to connect the defendant therewith, in corroboration of the accomplice Winfrey, as required by law."

The facts pertaining to and illustrative of these matters are sufficiently stated in the opinion below.

*Robt. B. Seay*, for appellant, filed an able brief in the case, and among other things contended, that reversible error was committed in the admission of the testimony of Cabell, the sheriff, and Lewis, his deputy, to the effect, that after Winfrey was arrested he informed them where the masks and slickers worn by the robbers could be found, and that they were found in pursuance of this information. His contention was, that this evidence was inadmissible against the appellant Land, because at the time Winfrey gave the information the conspiracy to commit robbery, if any, had been consummated; that it was hearsay; that it could be and evidently was, by the jury illegally used as corroborative of the accomplice testimony of said Winfrey. He cited Sanders v. The State, 31 Texas Crim. Rep., 525; Morris v. The State, 13 Texas Crim. App., 73; Armstead v. The State, 22 Texas Crim App., 58; Jump v. The State, 27 Texas Crim. App., 459; McKenzie v. The State, 32 Texas Crim. Rep., 577; Menges v. The State, 25 Texas Crim. App., 710; Martin v. The State, 25 Texas Crim. App., 576; Bookser v. The State, 26 Texas Crim. App., 593.

These same authorities were again cited and elaborately discussed in the able argument submitted by him in the motion for rehearing in this case, upon the admission of illegal testimony, and how the same should be considered on appeal, and quoted from Draper's case, 22 Texas, 401, as follows: "In such cases, we can not look to the whole case to determine whether or not there is other testimony sufficient to establish defendant's guilt. To do so, would be in effect to set aside the verdict of the jury, and to form conclusions for ourselves from the evidence." Citing also, in support of this doctrine, Preston v. The State, 4 Texas Crim. App., 186; Cox v. The State, 8 Texas Crim. App., 304; Tyson v. The State, 14 Texas Crim. App., 391; McWilliams v. The State, 44 Texas, 116.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was tried and convicted in the Criminal District Court of Dallas County for the of-

fense of robbery, and his punishment assessed at confinement in the penitentiary for twenty-five years, and from the judgment and sentence he prosecutes this appeal.

The appellant complains, that the sheriff carried the defendant, shortly after the alleged robbery, before the witnesses J. N. Gillock, Mrs. Stella Gillock, and Mrs. Mary Ogden, for the purpose of identification, and that they identified him; and said witnesses were permitted, over the objections of the defendant, to testify as to his being the same person whom they saw near the place of the alleged robbery on the evening of the same day, and a short time before it occurred. The contention of the appellant is, that he was thus compelled to make testimony against himself. It is not shown in the bill of exceptions that the defendant was compelled to go before said witnesses by the sheriff, but, to all appearances, he went voluntarily and of his own accord. If, however, it be conceded that defendant was forced to go with him by the sheriff, still it does not follow that the testimony of the witnesses, who were thus enabled to see and identify him as the person whom they saw on the evening of the robbery near the place where it was committed, was thus rendered inadmissible. No word or utterance of the defendant is shown to have occurred at the time, or of even the sheriff himself, as inducive to their identification of defendant; and the only fact that appears is that the witnesses, by the defendant's being brought there, were thus afforded an opportunity of seeing him. Had the witnesses themselves been carried to the jail and shown the defendant, they would have had the same opportunity to have seen him, and perhaps with more inducement or suggestion as to his identification. There was no error in permitting this testimony to be introduced. Fulcher v. The State, 28 Texas Crim. App., 465; Bruce v. The State, 31 Texas Crim. Rep., 590.

It is also contended by the appellant, that the court erred in permitting the sheriff, Cabell, to testify, that he found the masks and slickers alleged to have been worn by the parties committing the robbery concealed in a certain place, and that he had been told by witness Winfrey that they were concealed at said place, and that he found them in pursuance of said information. The appellant says that this is hearsay, and in view of the fact that Winfrey, an accomplice, testified against him, that his testimony was the most material evidence against defendant, and that under the charge of the court said witness had to be corroborated by other testimony tending to connect the defendant with the robbery, that the jury were liable to regard the testimony of Cabell as independent evidence, corroborating said Winfrey, and tending to connect the defendant with the commission of the offense charged. The witness Winfrey was an accomplice in the robbery, and if he himself had been on trial, and had made such declarations to the sheriff, they would have been admissible against him; and if it was shown that the robbery was in pursuance of a conspiracy between him and the appellant, all his declarations made pending the conspir-

acy, and up to and including the consummation of the robbery, would have unquestionably been admissible against both himself and his coconspirator. But these were declarations made long after the perpetration of the robbery, and, in our view, were not strictly admissible in this case. The question, however, for us to consider in this case, in view of the evidence, is, was the admission of this testimony calculated to prejudice the rights of defendant? The two parties who were robbed testified, that the two persons doing the act wore slickers and masks of a certain description. Winfrey testified, as he was authorized to do, that he and appellant wore slickers and masks of the same description as testified to above, and described the route they took in coming from the scene of the robbery, and where they concealed the slickers and masks. The sheriff also testified, as he was authorized to do, that in the vicinity of the robbery, and on the route of the parties committing it .back towards town, he found the slickers and masks concealed which answered the description given by the other witnesses, and were identified by the witness Winfrey. All this testimony was clearly admissible, and, moreover, it would have been permitted for the sheriff to state that he had found the slickers and masks in pursuance of information that he had received. While it may be conceded that the statement made to Cabell by the witness Winfrey, to the effect that they had concealed the slickers and masks at a certain place, describing the place, was not admissible testimony, as being hearsay, yet we fail to see how such a statement, under the circumstances, could have operated to the prejudice of defendant. The contention of the defendant, that said testimony was calculated to mislead the jury into the view that the finding of the goods by Cabell in the place where secreted, as stated to him by Winfrey, corroborated the witness Winfrey in a material fact, tending to connect the defendant with the robbery, we do not think tenable. In our opinion, it could have no more effect in this regard than the finding of the goods by the sheriff, where they were secreted, in the absence of any statement on the part of Winfrey.

When this case was called for trial, it appears that two witnesses, to wit, Mrs. Mary Ogden and her granddaughter, Miss Jimmie Burton, who had been summoned by the State, were not present, and the defendant objected to proceeding without their presence, as he stated he would require their testimony in his defense, whereupon the county attorney stated that the witnesses had been subpœnaed, and would be present. The court sanctioned his statement, and stated that their attendance would be enforced, and they would be compelled to appear as witnesses in this case. About this time the said two witnesses made their appearance in court, and were sworn and placed under the rule with the other witnesses. During the further progress of the trial, the witness Jimmie Burton, who was placed on the stand as a witness on behalf of the State, before she had answered any questions began crying, and said she was sick and could not testify. Thereupon, with the

sanction of defendant, she was excused by the court, and instructed to go with her grandmother into the court's private office pending further proceedings. The further examination of the witnesses was proceeded with on the part of the State until the hour of adjournment for the day. On the next morning the examination of the witnesses was resumed, and after the State announced that it rested, the defendant demanded that the witness Jimmie Burton be produced and put on the witness stand for examination. The State's counsel then said witness was still sick, and had gone home on the evening before, after she left the witness stand; and the State's counsel here offered to submit to the jury the facts that both State and defendant expected to prove by said witness, which offer the defendant's counsel refused to accept. The defendant then presented a motion to postpone or continue the case until said witness Jimmie Burton could be produced, so that the defendant could have the benefit of her testimony on the trial. The defendant stated in that connection, that he expected to prove by said witness that she was present at the well near the house of Mrs. Mary Ogden when the witness Mary Ogden was present, and who testified in this case that she then identified the defendant as one of the two men who were present at said well on the evening of the robbery, a short time before it occurred—said well being about 100 yards from the place of its commission—and that by the said witness defendant expected to prove, that appellant was not one of the two men who were at the said well at said time, and further, that before this trial, after the defendant had been arrested and placed in jail, said witness was brought to the jail for the purpose of identifying the defendant as one of the two men, and that she then and there stated that he was not one of the men. The court overruled the motion of the appellant to postpone or continue said case for the evidence of said witness. The defendant excepted.

The defendant also urged the same ground in his motion for a new trial of the case, which being overruled, he excepted thereto. And the defendant now assigns this action of the court as a ground for reversing this case. Article 568, Code of Criminal Procedure, provides for the continuance of a case after the trial has commenced: "In such case it must be made to appear to the satisfaction of the court that by some unexpected occurrence since the trial commenced, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial can not be had. The trial may be postponed to a subsequent day of the term, or continued." It appears from the record in this case that the defendant sought to avail himself of the above provision. It is not made to appear, however, that the defendant had ever sued out process for said witness Jimmie Burton, nor is it shown that he desired the evidence of said witness until at the very threshold of the trial; and moreover, when he asked for a postponement or a continuance of the case, he did not then ask for process to compel the attendance of the witness, although it was shown that she

lived near by. But admiting the defendant used proper diligence, as he was authorized to avail himself of the State's process, the question then presents itself, was he entitled to a new trial on account of the absent testimony? The rule, as we understand it, is as follows: "It is not in every case, however, even where the absent testimony is material and probably true, that this court would revise the trial judge in refusing a new trial considered with reference to the application for the continuance. It is only in a case where, from the evidence adduced upon the trial, we would be impressed with the conviction not merely that the defendant might probably have been prejudiced in his rights by such ruling, but that it was reasonably probable that if the absent testimony had been before the jury, a verdict more favorable to the defendant would have resulted." Pruitt v. The State, 30 Texas Crim. App., 156. In McAdams v. The State, 24 Texas Criminal Appeals, 86, following Hollis v. The State, 9 Texas Criminal Appeals, 643, this rule is stated: "If there is such a conflict between the inculpatory facts and those stated in the application as to render it impossible that the facts stated in the application are material, and probably true, the continuance should be refused. There must, however, not only be such a conflict, but the inculpatory facts must be so strong and convincing as to render the truth of the facts set forth in the application improbable."

Taking into consideration the legal principles here stated, as the correct rule, let us look to the salient features of the testimony in this case, in order to ascertain whether there was error in the court's refusing to postpone or continue said cause. Frank Daniel, one of the parties robbed, in his testimony, identified the defendant as one of the robbers. Both of the Daniels, witnesses in this case, identified the slickers and the masks that the robbers had on, and that were subsequently found on the track the robbers took towards town after the robbery. A number of witnesses identified the defendant, Land, whom they personally knew, in the vicinity of the robbery—some of them, not more than 100 yards from the place of its commission, on the evening of the robbery, a short time prior thereto. This was an unusual place for the defendant to be, as his business was in town, he being a hackman. He was seen on the same evening after the robbery, with Winfrey, between the scene of the robbery and the town of Dallas, on his way back. Witness Winfrey fully details all the circumstances of the robbery, showing what he and the defendant did from its beginning to its end, and his testimony is corroborated in a number of material respects. Now, the testimony for which the continuance was asked was that of Jimmie Burton, by whom it was proposed to prove, that she was at the well near Mrs. Ogden's when the two men came up in the evening before the robbery, and got some water, and that the defendant was not one of the men. This testimony would have been in rebuttal of the evidence of the witness Mary Ogden, who testified that defendant was one of the men.

If the testimony of Mary Ogden is eliminated from this case entirely, still the evidence is abundantly sufficient to sustain the conviction in this case. So, applying the rules above stated to the evidence for which the continuance was asked in this case, and conceding that the testimony of the witness Jimmie Burton was material and probably true, it would only show that defendant was not at the well where Mrs. Ogden testifies he was on the evening of the alleged robbery, and it would not prove that defendant was not at other places in the vicinity of the robbery a short time prior thereto; and in our opinion it is not reasonably probable that, if such absent testimony had been before the jury, it would in any way have affected the result. While the evidence was in conflict with some of the inculpatory facts offered by the State, yet the inculpatory facts in this case are so strong and convincing as to render the truth of the facts set forth in the application improbable, and the court did not err in overruling the application. In this same connection, with reference to the testimony of Jimmie Burton that she was carried to the jail, and there saw the defendant, and stated that he was not one of the men whom she saw at the well, it is not made to appear who it was that carried her to the jail. We take it for granted that she must have been conducted into the jail by the sheriff, or some of his deputies, and the testimony of such witness or witnesses, that she stated that the defendant was not one of the men whom she saw at the well, could have been offered by the appellant as original testimony, and yet it is not shown that any effort was made to procure such testimony. Ruston v. The State, 4 Texas Crim. App., 432; Hester v. The State, 15 Texas Crim. App., 568; Bruce v. The State, 31 Texas Crim. Rep., 592. We would further observe, that the defendant should have shown by his bill of exceptions that this was his first application. This he failed to do. See Arnold v. Hockney, 51 Texas, 46. In this regard there is a difference between first and second applications for continuance, it being incumbent for defendant to show on a second application that he could not procure any other testimony of the occurrence at the jail than that of the witness Jimmie Burton, for whom the continuance was asked. He should have done this in order to have brought himself within the rule of law authorizing a continuance.

Other matters complained of by appellant we deem it unnecessary to discuss.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.