## El Pueblo v. Román.

Apelación procedente de la Corte de Distrito de Ponce.

No. 357.—Resuelto en abril 8, 1912.

Derecho Penal—Acusación—Lista de los Testigos de Cargo.—No hay precepto alguno imperativo en nuestras leyes penales que obliguen al Fiscal a relacionar en una acusación todos los testigos de cargo de los cuales tiene conocimiento. Es bastante con mencionar los nombres de aquellos que han sido examinados por él para presentar la acusación. Tampoco es esto un requisito en California, de donde procede nuestra jurisprudencia criminal.

Suspensión del Juicio—Sorpresa del Acusado—Testigos de Cargo no Relacionados en la Acusación.—Aunque no constituye error el no relacionar todos los testigos de cargo en la acusación, sin embargo, si resultare que el acusado ha sido sorprendido con la presentación de testigos cuyos nombres no fueron mencionados en la acusación, esta omisión es de gran peso para determinar si la corte sentenciadora abusó o nó de su facultad discrecional

al denegar la suspensión del juicio y permitir al acusado que consiga prueba en contra de dichos testigos.

ID.—NUEVO JUICIO—SORPRESA—SUSPENSIÓN DEL JUICIO.—Las mociones de nuevo juicio fundadas en sorpresa y las mociones solicitando la suspensión del juicio se rigen por las mismas reglas tanto en casos criminales como en los civiles.

ID.—SUSPENSIÓN DEL JUICIO—TESTIGOS AUSENTES—SUFICIENCIA DE LA MOCIÓN.— Cuando se solicita la suspensión de un juicio por estar ausentes de la Isla varios testigos que el acusado desea presentar para contradecir otros testigos de cargo, es necesario justificar que dichos testigos ausentes, comparecerán ante el tribunal en uno de los términos posteriores de la corte. También deben relacionarse los nombres de los testigos y los hechos acerca de los cuales versarán sus declaraciones. También debe demostrarse la buena fe por parte del peticionario.

ID.—TESTIGOS AUSENTES—ADMISIÓN POR EL FISCAL DE QUE DECLARARÁN EN DE-TERMINADO SENTIDO.—Cuando hay testigos ausentes de la Isla que un acusado desea presentar, es suficiente para impedir la suspensión del juicio por tal motivo, que el Fiscal admita, no la veracidad de sus declaraciones, sino que declararán en determinado sentido.

ID.—DECLARACIÓN DEL ACUSADO—TESTIGOS—SILENCIO DEL ACUSADO EN CUANTO A CIERTOS EXTREMOS.—Los tribunales no se inclinan fácilmente a estimar como una presunción en contra de un acusado, su silencio al declarar sobre ciertos extremos, pero desde el momento en que un acusado se presenta como testigo debe ser considerado lo mismo que cualquier otro, pudiendo ser repreguntado y su silencio en cuanto a ciertos extremos que necesariamente debe conocer, puede ser criticado y comentado.

ID.—SUSPENSIÓN DEL JUICIO—DISCRECIÓN DEL TRIBUNAL SENTENCIADOR—EFECTO DE LA DECLARACIÓN DEL ACUSADO.—Cuando se discute el ejercicio de la facultad del tribunal sentenciador al denegar la suspensión de un juicio y cuando se le imputa al acusado la confesión del delito, y al declarar éste como testigo deja de negar el haber hecho tal confesión, ese extremo puede ser considerado por este tribunal para apreciar si hubo o nó abuso de discreción por parte del tribunal sentenciador al denegar la suspensión del juicio.

ID.—TESTIGOS—CREDIBILIDAD—MANIFESTACIONES INVEROSÍMILES.—La inverosimilitud de las manifestaciones de un testigo, no es motivo legal suficiente para desestimarlas, aunque disminuyen su peso y su credibilidad.

ID.—INSPECCIÓN OCULAR—DISCRECIÓN DEL TRIBUNAL.—El tiempo y manera de llevar a cabo la inspección ocular del sitio donde se cometió el delito, descansan en la sana discreción del tribunal, y no constituye abuso de tal facultad el llevar a cabo la inspección durante el día cuando el crimen se cometió al anochecer.

ID.—TESTIGOS DE CARGO—OMISIÓN DE PRESENTAR ALGUNOS.—El Fiscal no está obligado a presentar todos los testigos de cargo relacionados en la acusación.

Los hechos están expresados en la opinión.

Abogado del apelante: Sr. Herminio Díaz Navarro.

Abogado del apelado: Sr. Charles E. Foote, Fiscal.

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

·Durante el juicio de esta causa se presentó prueba con el objeto de demostrar que el día 9 de marzo de 1910 Fernando Collazo fué separado del empleo que tenía con el Sr. Salazar, comerciante de la ciudad de Ponce, por haberse encontrado un déficit en sus cuentas.  No regresó por la tarde a casa de su padre como era su costumbre.  El mismo día desapareció y no volvió a vérsele más en vida.  Hacia ese mismo día Salazar recibió una carta de Collazo participándole que en vista de las circunstancias tenía que marcharse.  Posteriormente, y hacia los meses de abril o mayo de 1910, se encontraron los restos de un ser humano en el sitio conocido por "La Flaca," cerca de la Playa de Ponce.  En estos restos faltaba el cráneo y otros huesos.  Subsiguientemente fué hallado un cráneo en un sitio cercano.  Los huesos que se encontraron primeramente fueron reconocidos por la ropa y demás objetos que aparecieron en los bolsillos, así como por otras señas, como de Fernando Collazo.  El cráneo fué suficientemente identificado por el dentista que había orificado los .dientes al interfecto.  En el cráneo había una fractura o hendidura hacia el lado izquierdo del hueso occipital.  En el juicio hubo un gran conflicto de prueba entre los peritos ·de la acusación y los de la defensa con respecto a la manera como se causó esta herida.  Todos los peritos estuvieron conformes en que ella ciertamente había causado la muerte de Collazo, pero los peritos del Fiscal trataron de demostrar con sus declaraciones, que la herida se produjo por un fuerte golpe inferido con un instrumento contundente, y los de la defensa que fué el resultado de un tiro que se disparó el mismo interfecto.  El revolver de Collazo apareció en otro sitio distinto con una bala disparada.  El testigo que lo encontró lo tuvo guardado por algún tiempo, siendo sus manifestaciones vagas y dudosas con respecto a la fecha y forma en que lo encontró.  Apareció además, que Fernando Collazo y Alberto Román, el acusado, acostumbraban visitar a la misma mujer, Rosario Aneiro.  También se presentó prueba con el objeto de acreditar el hecho de que Román nunca visitó la casa de Rosario Aneiro por la noche, has-

ta después que Collazo se había ido de allí. Se presentó prueba tendente a mostrar que los dos hombres eran enemigos y que hacía tal vez un año con anterioridad al juicio, que Román fué a ver al padre de Collazo y le manifestó que sería conveniente que su hijo Fernando dejara de visitar a Rosario Aneiro. Asimismo se presentó prueba con el fin de demostrar que un día Román se encontraba parado en un acera, vió pasar en coche a Collazo y Rosario Aneiro, y se abalanzó contra ellos.

Pedro Olivera fué un testigo del Fiscal. Declaró que en la noche del día 9 de marzo, y entre 7:30 y 8, vió a Román y a Collazo que paseaban juntos en cierta parte retirada de la Playa de Ponce, cerca del cementerio, y por los alrededores del sitio donde fueron hallados los restos de Collazo. Que primeramente paseaban juntos, al parecer como amigos, y el testigo, sabiendo las relaciones que entre ellos existían con motivo de Rosario Aneiro, se sorprendió al verlos juntos y se despertó en él la curiosidad de seguirlos aunque temerosamente, a una distancia como de cincuenta pasos. Conversaron algo que el testigo no pudo oir porque el viento era contrario, y observó también un movimiento que hizo Román con su mano en la forma que indicó el testigo, pero no pudo apreciar si tal movimiento tuvo por objeto agredir a Collazo. Siguieron paseando, y cuando iban por el camino del cementerio, se pararon otra vez, haciendo Collazo un movimiento como para volver hacia atrás, y Román con sus palabras como que lo convenció y le puso la mano por el hombro; que el testigo aprovechó ese momento y se escondió para ver lo que iban a hacer; que cogió a la izquierda, se adelantó a ellos y se escondió en una zanja de una pieza de caña que allí había. Cualquiera que lea por primera vez esa declaración tendrá que pensar que el testigo pasaba con frecuencia por esas zanjas, pero puede ser que él simplemente incurra en una repetición y se refiera a la misma zanja. Que cuando ellos llegaron frente a una casa de mampostería, tuvieron unas palabras diciéndole el acusado a Collazo: ''Eres un sinvergüen-

za, y me vas a pagar las que me debes'' usando la frase en el sentido en que seguramente la interpretó el jurado, o sea que Román trataba de vengarse de Collazo; que Collazo contestó: ''Parece mentira que Vds. me hayan traído aquí engañado,'' y tan pronto como dijo eso, Román le dió un fuerte golpe en el cuerpo y después le dió otro golpe en la cabeza, cayendo Collazo al suelo; que en ese momento el testigo oyó como el cerrojo de una puerta que se abría y cerraba y en el acto salieron dos individuos de un palo de guásima que hay allí; que eran dos hombres con gorras parecidas a las de la policía; que él cree que eran policías; que tuvieron allí algunas palabras con Román que no pudo oir, y enseguida cogieron a Collazo entre los tres, uno por los pies y los otros por las manos y lo cargaron pasándole por en frente del testigo, quejándose el muchacho amargamente; que al pasar por frente de él, como a ocho o diez pasos de distancia, le dijo uno de aquellos individuos a Román: ''Ten en cuenta que el muchacho está vivo,'' contestando Román: ''Pierde cuidado, déjamelo por mi cuenta''; que no vió lo que hicieron con el cuerpo de Collazo y solamente vió cuando lo llevaban cargado; que estuvo allí cerca de media hora o tres cuartos de hora y vió a las dos personas vestidas de trajes de policía que venían muy ligero; que se bajó otra vez cuando pasaban, y cuando le dieron la espalda, se fijó que más adelante había un coche, y, al llegar ellos, el coche echó a correr siguiendo como para los ''Pámpanos''; que en esos momentos se fijó y vió al acusado que llevaba una cosa en la mano en la forma indicada por el testigo, muy aprisa, con dirección al mar y que no volvió a verlo hasta el día del juicio.

El testigo insistió en este asombroso relato en el examen de repreguntas. Varios testigos negaron algunos de los detalles de su relato, pero lo principal de su declaración no pudo ser contradicho.

Alberto Román fué devuelto de Cuba mediante procedimientos de extradición. El fué a Cuba con Rosario Aneiro con el supuesto nombre de González. El y Rosario tuvieron

el mismo camarote en la mayor parte del viaje y se tenían o hacían pasar por marido y mujer, lo que había causado gran sorpresa a los puertorriqueños que con ellos iban y que conocían a Alberto Román.

Durante la prisión de Román en la cárcel de "Vivac" de Santiago de Cuba, esperando su deportación, declararon dos testigos, uno de los cuales había tenido una entrevista con él, en la que el prisionero le refirió ciertos hechos que con anterioridad habían sido admitidos como ciertos en el juicio, a saber, que el acusado fué a Cuba con un nombre supuesto en compañía de Rosario Aneiro; hablaron sobre el desfalco de Collazo y lo probable de su culpabilidad; y sobre que en el juicio por portar armas prohibidas se había ocupado una macana en poder del acusado. Entonces el testigo Carcasés preguntó al acusado si conocía la certificación que había dado el médico después de hacer el examen del cráneo, respondiendo el acusado que nó; en seguida el testigo entregó al acusado un periódico, el "Diario de Puerto Rico" en el que se hacía un relato del crimen, exclamando entonces el acusado: "Carajo, me han cojido como a un chino; yo debí haberme ido a Haití donde no hay tratado de extradición, y me vine a meter en Santiago de Cuba." Cuando el testigo se levantó para irse, el acusado le suplicó que no hablara de nada de lo que le había dicho porque podía comprometerle. Eso se lo dijo a lo último, después que tuvo ese arranque, según el testigo.

Se enseñó al jurado el sitio en que tuvieron lugar los sucesos a que se refiere Olivera. No hay prueba alguna de la complicidad de otras personas en el crimen, excepto la que aparece de las manifestaciones hechas por este testigo. No hay prueba alguna por la que se establezca que algunos amigos de Alberto Román estuvieran relacionados con el crimen, ni ninguna otra prueba para probar la existencia del coche en que iban los supuestos policías. Se probó que Olivera no habló de estos sucesos de la noche del 9 de marzo, hasta dos meses después. Dice que guardaba silencio por el temor que tenía. Estuvo bajo la vigilancia de la policía desde la fecha

en que hizo su revelación hasta el día del juicio. Dos testigos declararon que vieron a Alberto Román cierta noche en los alrededores del teatro en una fiesta religiosa que se celebraba a eso de las ocho y media o nueve, tomando el abogado del acusado la silla como testigo para manifestar que había comprobado que la ceremonia religiosa tuvo lugar en la noche del día 9 de marzo. El jurado sabía el tiempo que se emplea en ir de la Playa a Ponce.

Con estos hechos hubo prueba suficiente tendente a mostrar la culpabilidad del acusado. Alega sin embargo el apelante, en primer lugar, que la corte cometió error al permitir que declararan ciertos testigos cuyos nombres no aparecían especificados en la acusación, y especialmente porque entre estos nombres no se habían incluído los de los testigos Carcasés y Callejas; segundo, que la corte cometió error no concediendo la suspensión del juicio con el fin de que el acusado tuviera una oportunidad de obtener la prueba que necesitaba para atacar la suministrada por los testigos Carcasés y Callejas; y tercero, que la prueba aportada por la declaración de Olivera es tan improbable, confusa y contradictoria, que no merece ser tomada en consideración, y que sin tal declaración no habría suficiente prueba para establecer la culpabilidad del acusado más allá de una duda razonable.

Con referencia a la cuestión de que se incluyan los nombres de los testigos de la acusación, no hay precepto legal alguno que de modo imperativo exija al Fiscal que haga una relación de todos los testigos que conoce. Es bastante con que mencione aquellos que él ha examinado con el fin de presentar la acusación. En algunos estados es un requisito legal imperativo que se acompañe una relación de todos los testigos, pero no sucede así en California de donde procede nuestra jurisprudencia. (*People* v. *Symonds,* 22 Cal., 349; *People* v. *Jocelyn,* 29 Cal., 564; *Pueblo* v. *Kent,* tomo 10, Dec. P. R., pág., 343.) Aunque no existió ningún error técnico, si resultara sin embargo que el acusado en realidad fué sorprendido por haberse presentado algunos testigos cuyos nombres no

habían sido incluídos en la acusación, el dejar de mencionar dichos testigos es una cuestión a la que siempre debe dársele gran consideración al determinar si la corte abusó o nó de su discreción al negar la suspensión del juicio, para que el acusado tuviera oportunidad de presentar su prueba contradictoria.

Llegamos ahora a la cuestión referente a la solicitud que presentó el acusado pidiendo la suspensión del caso.

Después de haber quedado constituído el jurado, el abogado del acusado, Sr. Canals, presentó una declaración jurada en la que expresaba que al llegar a su oficina en la mañana del juicio, inconscientemente abrió una carta dirigida al Fiscal por conducto del declarante; que la expresada carta tenía el sello de correos de Cuba y de allí había llegado el día antes; que el que escribió la mencionada carta que ocupaba el cargo de jefe interino de la cárcel de "Vivac," negaba de modo categórico que se hubieran celebrado conferencias en relación con el crimen de que se acusaba a Alberto Román, y que se decía habían tenido lugar en aquella cárcel, de Santiago de Cuba; que tenía informes de personas que le merecían entero crédito; que las personas a que se refiere la carta, los Sres. Carcasés y Callejas, iban a ser presentados en el juicio como testigos del Fiscal para que declararan con referencia a la entrevista a que nos hemos referido; que dada la importancia que pueden tener estas declaraciones en el resultado de esta causa, era necesario que se diera al acusado una oportunidad de atacar las mismas con la declaración de la persona que firma dicha carta, así como la del jefe del departamento en que tuvo lugar la entrevista; y el declarante suplicó a la corte que suspendiera el caso a no ser que el fiscal estuviera conforme en no presentar tales testigos en el juicio. La corte desestimó la solicitud.

Después que los mencionados testigos Carcasés y Callejas habían declarado en el juicio de esta causa, volvió a presentarse la anterior moción, pero sin más declaraciones juradas.

Después de haber sido declarado culpable por el jurado

el acusado, se presentó una moción para un nuevo juicio, siendo uno de los fundamentos de dicha moción, el hecho de no haber accedido la corte a la suspensión del caso y permitido al acusado buscar su prueba contradictoria con respecto a la supuesta confesión o entrevista. En la moción se incluía una petición para que se diera al acusado una oportunidad con el fin de adquirir ciertas declaraciones juradas contrarias, y se acompañó a la misma una declaración jurada de Alberto Román en la que en substancia se dice lo siguiente:

Que después de haber comenzado el juicio de esta causa había tenido informes que eran dignos de crédito, de tres empleados de la cárcel de Santiago de Cuba donde había estado preso el acusado, de que estaban dispuestos a venir a Puerto Rico y comparecer ante cualquier corte para probar la falsedad de las admisiones a confesión que se imputaban al acusado y a las que se hacía referencia en la declaración del testigo Porfirio Carcasés; que ese testigo se trajo expresamente de Cuba para declarar en la causa sin que de ello tuviera verdadero conocimiento el acusado hasta después de haber comenzado el juicio, sin que tampoco supiera hasta entonces que dicho testigo iba a ser usado en su contra, sin saber tampoco sobre qué extremos iba a versar su declaración, ni estaba incluído el nombre de este testigo al respaldo de la acusación, ni jamás se informó al acusado que el referido testigo iba a ser utilizado por el Fiscal; que el veredicto rendido en este caso tenía necesariamente que estar influído grandemente por esas admisiones y confesión del acusado a que se refirió Porfirio Carcasés, las que sostuvo y luego quedaron corroboradas por la declaración de otro testigo llamado Callejas que también se trajo de Cuba en las mismas condiciones de sorpresa para el acusado que Carcasés; que los empleados de la cárcel de ''Vivac'' en Santiago de Cuba a que se ha hecho referencia son Alfredo García, jefe de la cárcel; Antonio Palomo, jefe auxiliar del mismo departamento y Benigno Aparicio que es también un empleado del ''Vivac''; que sus declaraciones juradas son en substancia como siguen: Que conocían a Alberto

Román; que allí estuvo preso; que tuvo ocasión de hablar con Porfirio Carcasés; la forma en que se celebró esa entrevista; que Antonio Palomo y Benigno Aparicio saben que el acusado no hizo admisiones o confesión de ninguna clase a Porfirio Carcasés; que Alfredo García sabe que ninguna persona llamada Callejas estuvo presente en la mencionada entrevista; y que solamente se encontraba allí Antonio Palomo durante toda la entrevista, y Benigno Aparicio en una parte de la misma; que el acusado tiene el ofrecimiento de una de estas personas, Antonio Palomo, y por él el de otras dos que están dispuestas a venir y declarar con respecto al asunto en cualquier momento que se les llame.

Cuando la solicitud de suspensión del juicio fué presentada originalmente a la corte, es indudable que el tribunal no tenía suficientes datos para conceder dicha suspensión. Ni los nombres de los testigos, ni los extremos de sus declaraciones fueron expresadas en el *affidavit*. El Ministerio Fiscal no tuvo medios para poder admitir la certeza del *affidavit,* ni para hacer manifestación alguna con respecto a su contenido, ni para presentar *contra-affidavits*. No se alegaron razones suficientes para demostrar que los testigos nombrados comparecerían ante el tribunal en uno de los términos posteriores; no se hizo manifestación alguna fundada en información o creencia o en cualquiera otra base para demostrar que el acusado nunca había hecho admisión o confesión alguna a un tal Carcasés o cualquiera otra persona mientras estuvo detenido en la cárcel de Santiago de Cuba. Desde luego que hubiera sido difícil para el acusado negar manifestaciones de testigos que no habían declarado; pero igual razonamiento podríamos aplicar a la resolución de la corte denegando la suspensión del juicio. No es posible que el tribunal pudiera apreciar la pertinencia o importancia de la prueba en aquel momento del juicio. Tampoco se presentó *affidavit* para demostrar que la suspensión no se pedía para demorar el juicio. Casi no existía constancia alguna ante el tribunal que demostrara que la suspensión del juicio se pidió de buena fe.

No se alegó nada que demostrara que la carta no había sido procurada por el acusado. El haber dejado de negar este extremo da lugar a que se suponga que el acusado pudo haber tenido conocimiento mucho antes del juicio, del carácter de la declaración que iban a prestar los testigos de Cuba. Y si tenía  ese conocimiento con anterioridad al juicio, lo que así parece indicar el *affidavit* presentado posteriormente al solicitarse el nuevo juicio, en tal caso el acusado es culpable de falta de actividad en no haber pedido la suspensión del juicio hasta después que el jurado había prestado juramento. El *affidavit* que se acompaña a la moción solicitando el nuevo juicio alegaba que el acusado no tuvo tiempo para escribir a Cuba, y sin embargo, él expresa la naturaleza de las declaraciones que habrían de dar los testigos. Era, según se desprende de todo lo expuesto, tan defectuosa legalmente la solicitud de suspensión del juicio, que la resolución de la corte denegándola no puede considerarse como un abuso de discreción.

Los mismos argumentos son aplicables a la segunda petición de suspensión del juicio, pues aunque el tribunal conociera en esta segunda petición la naturaleza de las declaraciones que habían de dar los testigos, los requisitos legales que debía de reunir la petición y la buena fe del acusado al pedir la suspensión no habían sido demostrados. Bien podría quedar una duda en la mente del juez con respecto a si la solicitud fué presentada de buena fe.

El acusado no probó de modo satisfactorio que fuera sorprendido por las declaraciones de los testigos de Cuba. Las mociones de nuevo juicio fundadas en sorpresa y las mociones en que se solicita la suspensión del juicio, se rigen por los mismos principios tanto en lo civil como en lo criminal.

Los tribunales de Texas tienen una regla en virtud de la cual la revocación o confirmación de la resolución de un tribunal al denegar la suspensión del juicio, descansa por completo en los hechos probados en el juicio. (*Hyde* v. *State*, 16 Tex., 446; *Land* v. *State*, 34 Tex. Crim., 340; *Hooper* v. *State*,

29 Tex. Crim., 614.) Y los tribunales de otras cortes al apreciar cuestiones relativas a la suspensión de un juicio, se gobiernan por principios semejantes y necesariamente tiene que ser así, por que la suspensión del juicio entraña una cuestión de ejercicio de la facultad discrecional de la corte. (*State* v. *Rice,* 7 Idaho, 762; *State* v. *Wetter,* 11 Idaho, 433; 83 Pac., 341; *People* v. *Francis,* 38 Cal., 183; *State* v. *Fleming,* 17 Idaho, 471; 106 Pac., 305; *State of Montana* v. *Gibbs,* 10 Mont., 210; 10 L. R. A., 749. Véase nota. *Territory* v. *Shankland,* 77 Pac., 492.) Consideraremos la moción de nuevo juicio en lo que se refiere a la denegatoria de suspensión del juicio, a la luz de semejantes principios. Nada se alega en la moción de nuevo juicio con respecto al origen de donde se deriva el conocimiento que tenía el acusado de la naturaleza de las declaraciones que habrían de prestar los testigos. Era importantísimo para el tribunal el conocer el origen de este conocimiento para poder apreciar si la solicitud se hacía o nó con intención de demorar el juicio, o si los testigos comparecerían o nó ante la corte, y si el acusado había desplegado o nó actividad con anterioridad al juicio. La veracidad de las manifestaciones hechas por el testigo Carcasés no aparece contradicha en estas declaraciones juradas, y el acusado se limita a expresar que la comparecencia al juicio de los testigos de Cuba fué para él una sorpresa, y a manifestar los extremos acerca de los cuales los referidos testigos habrían de declarar. Si seguimos examinando aún mas sus *affidavits,* observaremos que la única persona que presenció la supuesta entrevista entre Carcasés y Román fué Antonio Palomo. Este niega que Alberto Román hiciera admisión o confesión alguna. Mucha de la jurisprudencia sobre este particular se expresa en el sentido de que cuando los testigos que se necesitan para un juicio residen fuera del alcance de la jurisdicción del tribunal, es suficiente que el Fiscal admita, no la veracidad de las manifestaciones que se dice harán, sino que los testigos efectivamente declararán en ese sentido. (*Fanton* v. *State,* 36 L. R. A., 158; *State* v. *Fleming,* 17

Idaho, 471, 106 Pac., 305; *State of Montana* v. *Gibbs,* 10 Mont., 210; 10 L. R. A., 749. Véase nota. *People* v. *Savant,* 112 Mich., 297; *Hoyt* v. *State,* 140 Ill., 588; 16 L. R. A., 239, y nota. Véase 9 Cyc., 182.) Prescindiendo de estas autoridades, nuestro propio Código de Enjuiciamiento Civil, en su artículo 202 establece la misma regla. Las cuestiones relativas a transferencias de juicios en casos civiles y criminales se rigen por iguales principios.

En la mayor parte de los casos es evidente que el acusado tiene derecho a la comparecencia personal de los testigos, sobre todo cuando los testigos son necesarios para declarar sobre algún punto relacionado con la comisión del delito mismo. Pero, cuando, como en el caso de autos, tiene sólo por objeto el negar ciertas manifestaciones hechas por el acusado, hubieran quedado cumplidos los fines de la justicia con la admisión solemne del Fiscal, de que el jefe sustituto del presidio de Santiago de Cuba declararía en el sentido de que presenció la conferencia ya mencionada y que la admisión acerca de la cual ha declarado Carcasés no fué hecha por el acusado. El público tiene interés en que las causas sean juzgadas con prontitud. No se trató de impugnar la veracidad o reputación del testigo Carcasés en modo alguno, excepto negando un hecho de su declaración. Tal negación pudo haberse verificado por medio de una admisión hecha por el Fiscal en el sentido de que el testigo declararía en la forma que se dice. Si ese procedimiento no fuera permitido, los juicios podrían demorarse indefinidamente a voluntad del acusado, siempre que los testigos residieran en sitios lejanos. (*Hyde* v. *State,* 16 Tex., 446; *People* v. *Francis,* 38 Cal., 183.) Por dejar de expresar el origen del conocimiento que tenía el acusado, muy bien podría la corte tener dudas de si iban a presentarse los testigos, y de venir, que ellos pudieran cambiar el resultado del juicio. El tribunal tenía el derecho de apreciar la manera de conducirse y de declarar los testigos y si decían verdad, y este razonamiento podemos aplicarlo a los testigos que residían en Cuba. En cuanto a este extremo de la aplicación del

tribunal, hay un punto importantísimo. Después de la terminación del caso por parte del Fiscal y de declarar algunos de sus testigos, el acusado declaró como testigo. Su declaración se refirió exclusivamente a explicar el por qué se embarcó para Cuba con nombre supuesto. Guardó silencio absoluto en cuanto a los otros extremos de su causa. Su silencio tenía necesariamente que impresionar al jurado y al juez que presidió el juicio. Aun cuando los tribunales no estimen que existe una presunción contra el acusado por dejar éste de declarar en cuanto a todos los extremos del juicio, una vez que se presenta como testigo (*Balliet* v. *United States,* 129 Fed. Rep., 695), la doctrina universal es que cuando un acusado declara como testigo debe ser tratado lo mismo que cualquier otro testigo. (*Reagan* v. *U. S.,* 157 U. S., 305; *Brandon* v. *People,* 42 N. Y., 265; *Stover* v. *People,* 56 N. Y., 315; *McGarry* v. *People,* 2 Lansing [N. Y.], 227; *State* v. *White,* 27 Am. Rep., 137, y notas, pág. 144; *Price* v. *The U. S.,* 14 D. C. Appl., 391; *Mirando* v. *State,* 50 S. W., 714; *Quintana* v. *State,* 29 Tex. Crim., 401; *Commonwealth* v. *Nichols,* 114 Mass., 285; 19 Am. Rep., 346, y notas. *Woburn* v. *Henshaw,* 101 Mass., 193; 3 Am. Rep., 333; *Commonwealth* v. *Pratt,* 126 Mass., 462; *People* v. *Freshour,* 55 Cal., 375; *Commonwealth* v. *Bonner,* 97 Mass., 587; *Commonwealth* v. *Morgan,* 107 Mass., 199; *Commonwealth* v. *Mullen,* 97 Mass., 545; *Connors* v. *People,* 50 N. Y., 240; *People* v. *Casey,* 72 N. Y., 393; *Heldt* v. *State,* 30 N. W., 626; *State* v. *Ober,* 19 A. R. 88.) Algunos de los precedentes casos y otros más han sido citados con aprobación por el Tribunal Supremo de los Estados Unidos al considerar una cuestión semejante en el muy reciente caso de *Powers* v. *United States,* febrero 19, 1912. Al declarar, renuncia el privilegio que le concede la ley y puede ser repreguntado, y el haber dejado de explicar un punto necesariamente dentro de su conocimiento, puede ser objeto de comentario. (*Brandon* v. *People,* 42 N. Y., 265; *Stover* v. *People,* 56 N. Y. 315; *State* v. *Duncan,* 38 Am. Rep., 895, y notas. *Lienburger* v. *State,* 21 S. W., 603.) Desde luego

que esta doctrina no debe por interpretación extensiva hacer ilusorio el privilegio que tiene un acusado. Tal vez los tribunales no deban proceder de ligero, al determinar si existe o nó preponderancia en la prueba contra el acusado, dar una importancia excesiva al hecho de no haber declarado el acusado con respecto a ciertas cuestiones, aun en el supuesto de que éstas sean importantes; pero cuando se discute el ejercicio del poder discrecional de un tribunal y se le atribuye al acusado una confesión, y al declarar éste como testigo no niega el haber hecho tal confesión, esto puede ser apreciado por esta corte al determinar si el tribunal inferior abusó o nó de su discreción al denegar la petición. Si el acusado hubiera negado la declaración de Carcasés, nos hubiéramos encontrado con un juramento contra otro juramento. El acusado no solo dejó de negarla sinó que en su *affidavit* que acompañó a la moción de nuevo juicio no negó la veracidad de la misma. De la manera en que la carta fué aportada como prueba al juicio, del modo de conducirse los testigos incluyendo al mismo acusado, y de sus manifestaciones y omisiones, el tribunal tenía derecho a juzgar si podría haber probabilidad alguna de que el resultado del juicio fuera modificado, dando al acusado ocasión para que presentara los testigos residentes en el extranjero. No podemos declarar que el tribunal cometiera abuso de discreción. El tribunal tenía el derecho de creer, en tales circunstancias, que el acusado no tenía medios adecuados para contradecir las declaraciones de Carcasés y Callejas.

La narración del testigo Pedro Olivera contenía algunas circunstancias inverosímiles, pero la inverosimilitud de las manifestaciones de un testigo, nunca, como cuestión de ley, es motivo suficiente para rechazarlas, aunque desmerezcan su credibilidad y peso. (*State* v. *Adder,* 61 S. W., 187; *Bishop* v. *State,* 43 Tex., 390.) Su declaración fué confirmada por los peritos médicos del ministerio Fiscal quienes declararon que la herida fué necesariamente producida por un instrumento contundente. Para rechazar por completo su declaración tendríamos que creer que tenía algún motivo contra el acusado o

que era un visionario ó un loco, y no hay prueba alguna ten-
dente a establecer la certeza de tales hechos, fuera de su mis-
mo testimonio.   Fué. cuidadosamente repreguntado haciendo
un relato detallado que aparece reproducido en los autos de
una manera vaga.   Pero el jurado le oyó e inspeccionó el sitio
descrito por él, y con vista de los hechos probados en el juicio
no tenemos razón alguna para revocar el veredicto del jurado,
por el fundamento de la inverosimilitud de la declaración de
este testigo.

Además de la excepción relativa al hecho de no incluír el
Fiscal en su acusación los nombres de todos sus testigos, el
apelante hace referencia en su alegato a otros tres fundamen-
tos de error.   El primero de éstos consistió en que al conce-
derse el examen o inspección ocular, la corte debió haber orde-
nado que dicho examen o inspección se hiciera a la hora pre-
cisa a que se refirió el testigo Olivera, o sea entre 7:30 y 8 de
la noche.   Alega el abogado que esa inspección hubiera sido la
única y mejor prueba.   No entendemos así la regla relativa a
la mejor clase de evidencia.   De seguirse la teoría de la de-
fensa, tendrían que reproducirse las mismas condiciones at-
mosféricas y demás circunstancias que se desarrollaron en
aquel lugar.   Además, la inspección ocular pudo haber tenido
por objeto el permitir al jurado que se cerciorara de todos los
detalles del sitio en que ocurrieron los sucesos, inspección que
hubiera resultado muy ventajosa en la investigación de la
verdad si se hubiera hecho en plena luz del día.   Esta fué una
cuestión discrecional en la corte, y no vemos que ésta haya
abusado de modo alguno en .el ejercicio de tal discreción.

El apelante alega que debió haberse exigido al Fiscal, de
conformidad con la moción que a ese efecto presentó la defen-
sa, que examinara o presentara en el juicio los testigos. cuyos
nombres se habían insertado en la acusación.   No encontramos
precepto legal alguno en las leyes de Puerto Rico o en las de
algún estado de los Estados Unidos que exija semejante prác-
tica.   Las autoridades se expresan en sentido contrario.
(*People* v. *Quick*, 51 Mich., 547; *Bressler* v. *People*, 3 N. E.,

521.)   El acusado tenía derecho a hacer al jurado las observaciones oportunas referentes al hecho de no presentar el Fiscal algunos de los testigos, cuyos nombres se habían incluído en la acusación.

En la única otra excepción en que el apelante insiste, es que la corte cometió error ordenando la eliminación de ciertas pruebas que se presentaron con el fin de impugnar la credibilidad de los testigos.   Para probar que la declaración de Pedro Olivera no era digna de crédito, el acusado presentó al testigo Francisco Parra Capó, quien declaró que Pedro Olivera vino a verle a nombre de una persona conocida por el ''Cubano,'' que se encontraba preso en la cárcel de Ponce por falsificar monedas, y quien un año después vino acompañado de Olivera a ver a dicho Parra, manifestando en presencia de Olivera que había estado haciendo monedas falsas por algún tiempo, y le pidió que le ayudara para comprar la materia prima con tal fin, ofreciéndole devolvérsela con creces.   Pero también resultó de la declaración de Parra Capó, que el Cubano había sido absuelto, y que Pedro Olivera le había servido de instrumento, trayendo al ''Cubano'' donde Parra para darle las gracias por haberle dirigido al abogado que le ayudó a obtener su absolución; que Olivera nada dijo en la entrevista, cuyo fin principal fué hacer que el ''Cubano'' diera las gracias.   No hubo nada que mostrara que Olivera y el ''Cubano'' fueran íntimos amigos o estuvieran asociados en la comisión de delitos, o que Olivera fuera el correvedile del ''Cubano.''   Esta prueba no fué pertinente ni esencial, y era demasiado remota.   Que Pedro Olivera debió haber prestado ayuda al ''Cubano'' cuando éste estaba mal y debió haberlo acompañado donde Parra a darle las gracias por haber salido absuelto, es un hecho que estaría más bien a favor que en contra de Olivera.

De todos modos, la declaración de Parra no produjo el efecto legal de atacar la veracidad del testigo Pedro Olivera.

Las instrucciones dadas al jurado fueron amplias y no se

formuló ninguna objeción a las mismas, y no encontramos error en ellas.

El jurado oyó las pruebas, así como las declaraciones prestadas por los testigos, tanto a favor como en contra del acusado, y dió la debida consideración a todas las circunstancias del caso, así como también a la prueba de coartada que presentó el acusado. Hubo gran contradicción en la prueba, pero el jurado después de recibir las debidas instrucciones, dictó su veredicto en contra del acusado; y no apareciendo nada de los autos ni en la prueba que muestre que haya habido pasión, prejuicio, parcialidad o algún error manifiesto, estamos obligados a confirmar la sentencia.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. MacLeary, expresó estar conforme con la sentencia porque de los autos no consta que se haya cometido abuso de discreción por parte del tribunal sentenciador, ni ningún otro error esencial.